# CASE NO. 23-1314

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KENNETH M. BROOKS & ANITA WOLKE BROOKS

V.

COMMISSIONER OF INTERNAL REVENUE SERVICE

ON PETITION FOR REVIEW OF AN ORDER OF
TAX COURT JUDGMENT DISALLOWING CHARITABLE
DEDUCTIONS AND ASSESSING PENALTIES AND INTEREST

## BRIEF OF APPELLANTS

SUBMITTED BY:
Steven G. Hall, Esq.
Joshua Tropper, Esq.
**Baker, Donelson, Bearman, Caldwell and Berkowitz, P.C.**
3414 Peachtree Road NE
Atlanta, GA 30326
(404) 577-6000
Shall@bakerdonelson.com
Jtropper@bakerdonelson.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1314     Caption: Brooks v. Commissioner of Internal Revenue

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kenneth M. Brooks and Anita Wolke Brooks
(name of party/amicus)

who is _____ Appellants _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Steven G. Hall          Date:     8/31/2023

Counsel for: Appellants

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................1

II.   JURISDICTIONAL STATEMENT ............................................5

    A.    Agency Jurisdiction. ..................................................5

    B.    This Court's Jurisdiction And Venue. .........................6

    C.    Timeliness of Appeal. ................................................6

    D.    Finality Of Underlying Decision. ...............................6

III.  STATEMENT OF ISSUES FOR REVIEW. ..............................6

IV.   STATEMENT OF THE CASE ...................................................7

    A.    Statement of Operative Case-Specific Facts. ...........7

V.    SUMMARY OF ARGUMENT .................................................13

VI.   ARGUMENT AND CITATION TO AUTHORITY ..................14

    A.    Standard Of Review. ................................................14

    B.    The Tax Court Erred In Finding There Was No CWA. ......................14

        1.    The Law And The Tax Court's Retroactive Application Of Improper Technical Standards. ................................................15

        2.    The Proper Analysis Highlights The Tax Court's Error. ...........21

    C.    The Tax Court Erred In Finding Appellants Failed To Comply With The Baseline Documents Requirements Of TR § 1.170A-14(g)(5). ..24

        1.    The Relevant Law. ..................................................24

        2.    The Tax Court Erred In Allowing The IRS To Insert Itself Into Process Established By TR § 1.170A-14(g)(5). ........................26

        3.    The Baseline Documents Were Adequate And The Court Erred In Finding Otherwise. .............................................28

    D.    The Tax Court Erred In Finding Appellants Failed To Meet The Substantiation Requirements Of TR § 1.170A-13(c)(2)(ii). ...............31

        1.    The Relevant Law. ..................................................31

        2.    The Court Erred Because Appellants Complied With A Proper Reading Of The Rules Relating To Provision Of Basis. ..........33

        3.    At A Minimum, Appellants Substantially Complied. ..............36

4. The Tax Court Erred By Failure To Find Reasonable Cause Excused Appellants' Provision Of Basis. .................................38

E. The Court Erred In Accepting The IRS's Valuation Because it Violated The Regulations And Law. ....................................40

1. Standard Of Review Applicable To The Tax Court's Valuation Decisions In This Case. ..............................................40

2. Regulatory Guidance on Valuation. ..........................................42

3. Facts Relevant To The Condition Of The Property. .................43

4. The Experts' Positions. ............................................................46

F. The Court Erred By Imposing A 40% Penalty. .....................................51

1. The Relevant Law. ....................................................................51

2. The Tax Court's Errors On The Penalty. ..................................52

VII. CONCLUSION. ....................................................................................54

VIII. STATEMENT REGARDING ORAL ARGUMENT ....................................55

# TABLE OF AUTHORITIES

Cases                                                                    Page(s)

*310 Retail, LLC v. Commissioner,*
   T.C. Memo. 2017-164 ........................................................................20

*Atlanta Dev. Auth. V. Clark Atlanta Univ., Inc.,*
   298 Ga. 575, 784 S.E.2d 353 (2016) ................................................22

*Averyt v. Comm'r,*
   104 T.C.M. (CCH) 65 (T.C. 2012) ............................................. 18, 19

*BC Ranch II, L.P. v. Comm'r of Internal Revenue,*
   867 F.3d 547 (5th Cir. 2017) ..........................................................4, 28

*Belair Woods, LLC v. Comm'r of Internal Revenue,*
   116 T.C.M. (CCH) 325 (T.C. 2018)................................. 33, 35, 36, 39

*Big River Dev., L.P. v. Commissioner,*
   T.C. Memo. 2017-166 ........................................................................20

*Bond v. Comm'r,*
   100 T.C. 32 (1993) ...................................................... 3, 17, 31, 32

*Burbage v. Comm'r,*
   774 F.2d 644 (4th Cir. 1985) ....................................................... 41, 51

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) .........................................................................21

*Degourville v. Commissioner,*
   T.C. Memo. 2022-93 ........................................................................54

*Durden v. Commissioner,*
   T.C. Memo. 2012–140........................................................................18

*Est. of Godley v. Comm'r,*
   286 F.3d 210 (4th Cir. 2002) .............................................................41

*Est. of Kaplin v. Comm'r*,
  748 F.2d 1109 (6th Cir. 1984) ..............................................................41

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ................................................................. 33, 35

*Freeport Title & Guar., Inc. as Tr. Of 1080 Bethlehem Church Tr. V. Braswell*,
  367 Ga. App. 123, 885 S.E.2d 73 (2023) ..............................................22

*French v. Comm'r of Internal Revenue*,
  111 T.C.M. (CCH) 1241 (T.C. 2016)......................................................19

*Graev v. Comm'r of Internal Revenue*,
  149 T.C. 485 (2017) ..............................................................................52

*Helvering v. Stuart*,
  317 U.S. 154 (1942) ..............................................................................21

*Hewitt v. Comm'r*,
  109 T.C. 258 (1997) ....................................................................... 17, 32

*Irby v. Comm'r*,
  139 T.C. 371 (2012) ..............................................................................16

*Lafarge Bldg. Materials, Inc. v. Thompson*,
  295 Ga. 637, 763 S.E.2d 444 (2014) ....................................................22

*Loube v. Commissioner*,
  T.C. Memo. 2020-3 ...............................................................................39

*McClurg Fam. Farm, LLC v. United States*,
  115 Fed. Cl. 1 (2014)............................................................................22

*Mitchell v. United States*,
  267 U.S. 341 (1925) ..................................................................... 42, 50

*Oakhill Woods, LLC v. Comm'r of Internal Revenue*,
  119 T.C.M. (CCH) 1144 (T.C. 2020)......................................................33

*Omnibus Budget Reconciliation Act of 1993*,
  1993-3 C.B. 393 (I.R.S. 1993)...............................................................16

*Pine Mountain Pres., LLLP v. Comm'r of Internal Revenue,*
 116 T.C.M. (CCH) 597 (T.C. 2018) ..................................................... 50

*Simmons v. Comm'r,*
 98 T.C.M. (CCH) 211 (T.C. 2009) ............................................... 16, 17

*Sims v. Jones,*
 158 Ga. 384, 123 S.E. 614 (1924) ...................................................... 22

*Stanley Works & Subsidiaries v. Comm'r,*
 87 T.C. 389, 1986 WL 22172 (1986) ..................................... 42, 43, 50

*State Highway Dep't of Georgia v. Bass,*
 197 Ga. 356, 29 S.E.2d 161 (1944) .................................................... 23

Tax Court issued,
 T.C. Memo 2022-122 ........................................................................... 13

*Tucker v. Comm'r of Internal Revenue,*
 T.C.M. (RIA) 2023-087 (T.C. 2023) .................................................... 3

*U.S. v. U.S. Gypsum Co.,*
 333 U.S. 364 (1948) ............................................................................. 41

*United States v. Baker,*
 279 F.2d 603 (9th Cir. 1960) .............................................................. 50

*United States v. McRae,*
 77 F.2d 88 (4th Cir. 1935) ............................................................ 29, 30

*United States v. Nat'l Bank of,*
 *Com.,* 472 U.S. 713 (1985) ................................................................. 22

*Waterman v. Comm'r,*
 179 F.3d 123 (4th Cir. 1999) ................................................. 14, 41, 42

Statutes

26 U.S.C.A. § 170 ................................................................................. 1, 16

26 USCA § 6662(c)(2) .............................................................................. 51

I.R.C. § 170 (h)(3) ...................................................................................... 8

I.R.C. § 170(f)(11) .................................................................9, 15

IRC. § 6213(a) .........................................................................5

IRC § 170(f)(8) ............................................................... passim

IRC § 170(f)(8)(A) ...................................................................16

IRC § 170(f)(8)(B) ............................................................. 18, 20

IRC § 170(h) ...........................................................................1

IRC § 170(h)(1)(c) ............................................................ 25, 26

IRC § 6662(c)(3) ....................................................................51

IRC § 6662(h) ........................................................................51

IRC § 6664(c)(3) ....................................................................52

IRC § 6751(b)(1) ......................................................... 7, 52, 54

IRC § 7482(a)(1) ......................................................................6

IRC § 7482(b)(1)(A) .................................................................6

IRC § 7491(c) ........................................................................52

IRC § 7701(o) ..........................................................................3

Section 170(f) ................................................................... 18, 19

Section 170(f)(8)(A) and (B) ...................................................17

Section 170(f)(8)(B)(ii) ...........................................................19

Regulations

26 C.F.R. § 1.170A ...................................................................1

26 CFR 1.170A-13 ............................................................ 2, 3, 16

26 CFR § 170 ...........................................................................2

Treasury Regulation § 1.170A-13(c)(2)(i)................................39

# I. INTRODUCTION[1]

This is an appeal from a Tax Court Judgment disallowing carry-forward charitable deductions for an individual, non-syndicated, conservation easement donated in 2007. The errors alleged arise from (1) the Tax Court's acceptance of retroactively imposed, hyper-technical interpretations of the statutes and regulations that govern conservation easements (ostensibly imposed by the IRS to prevent fraud and abuse), and (2) the Tax Court's adoption of a legally prohibited methodology to value the easement.

Conservation easements are a means by which the Country can benefit from the conservation of property by private parties, as an alternative to the costly and acquisition of conservation property by governmental entities.[2] Recognized in the late 1800s,[3] the use of conservation easements significantly expanded in the 1980s when Congress amended to IRC § 170(h) to encourage private conservation by providing a charitable deduction for taxpayers who donated conservation

---

[1] Revenue Statutes found at 26 U.S.C.A. § 170 *et seq*. shall be referred to as "IRC § ****." Treasury Regulations found at 26 C.F.R. § 1.170A *et seq*. shall be abbreviated as "TR § ****." Unless otherwise indicated, such references shall be to the IRC or TR as it existed at the time in question.

[2] *Conservation Easements: The Good, The Bad and The Ugly*, Dana Joel Gattuso, National Center for Public Policy Research, National Policy Analysis #569, May 1, 2008. Available at: https://nationalcenter.org/ncppr/2008/05/01/conservation-easements-the-good-the-bad-and-the-ugly-by-dana-joel-gattuso/; last visited August 28, 2023.

[3] *Id.*

easements in perpetuity. The Senate Finance Committee described Congress' purpose as follows:

> The committee believes that the preservation of our country's natural resources and cultural heritage is important, and the committee recognizes that conservation easements now play an important role in preservation efforts.

S. REP. NO. 96-1007 (1980). Currently, it is estimated that more than 37 million acres have been successfully conserved in the United States.[4]

While no one disputes there have been instances of fraud and abuse in conservation easements, Congress and the Secretary of the Treasury (the "Secretary") have repeatedly and regularly modified the laws and regulations to protect against such fraud and abuse, while still promoting Congress' underlying conservation goals.[5] As such, there is no place for the IRS and/or the Tax Court to disrupt the balance that has been set by Congress with the *ex post facto* imposition of new interpretations of the rules – interpretations that are so subjective and nuanced that they sweep up donors like Appellants, who relied on qualified tax and accounting professionals in good faith and made real conservation donations.

The IRS's now well-publicized effort to weaponize the rules and attack conservation easements on all fronts, is in marked contrast to the substance over

---

[4] National Conservation Easement Database, found at: https://www.conservationeasement.us/; last visited August 28, 2023.

[5] For instance, 26 CFR § 170 has been amended 31 times since its passage, while not all have been to Subsection (h), many have. Similarly, since 2018, 26 CFR 1.170A-13, one of the primary regulations at issue, has been amended by 4 times.

form rules the IRS frequently brings to bear in its dealings with taxpayers. (*See, e.g.,* IRC § 7701(o)).[6] Indeed, as it relates to conservation easements, in the years since the donation at issue, the IRS and the Tax Court have rejected the "substantial compliance" doctrine announced in *Bond v. Comm'r*, 100 T.C. 32, 41 (1993), and retroactively imposed a "strict compliance" doctrine without supporting statutory or regulatory amendment.[7]

This effort by the IRS and the resulting errors by the Tax Court, have profoundly impacted Appellants. By disallowing the carry forward deductions they had in 2010, 2011 and 2012 for a charitable deduction taken in 2007, the Tax Court has effectively ordered them to pay tax, penalties and years of interest that compounds daily for a good faith donation based on an understanding of the rules their professionals believed to be correct, and the law, as interpreted at the time, supported.

---

[6] "In scrutinizing the actions of taxpayers, the IRS frequently urges the court to apply the substance-over-form doctrine to disallow tax benefits. When it comes to wrangling with conservation easement donations, some might argue that the IRS has adopted the contrary approach, focusing on minutiae instead of the bigger picture — land preservation and its worth." *Is The IRS Still Mining For Foot Faults In Easement Cases*, Hale E. Sheppard, Tax Notes Federal, Vol. 78, No. 13, March 27, 2023, p. 2107.

[7] Compare the 1993 decision in *Bond*, finding that the substantiation requirements of 26 CFR 1.170A-13 are procedural or directory and may be fulfilled by substantial compliance, with the 2023 decision in *Tucker v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2023-087 (T.C. 2023) ("The doctrine of substantial compliance does not apply to excuse compliance with these strict substantiation requirements.")

It also affects the Country as a whole. The Country can properly adapt to rules and regulations that are dully proposed and adopted. However, the uncertainty and ambiguity introduced by the IRS's *ex post facto* imposition of new and subjective interpretations, compounded by the Tax Court's increasing acceptance of the IRS's approach, threatens the viability of the conservation easement program established by Congress. As the Fifth Circuit stated when addressing one of the very errors at issue here:

> The Tax Court's hyper-technical requirements for baseline documentation, if allowed to stand, would create uncertainty by imposing ambiguous and subjective standards for such documentation and are contrary to the very purpose of the statute. If left in place, that holding would undoubtedly discourage and hinder future conservation easements.

*BC Ranch II, L.P. v. Comm'r of Internal Revenue*, 867 F.3d 547, 556 (5th Cir. 2017).

Accordingly, for the reasons set forth in more detail below, Appellants request that this Court:

1. Reverse the Tax Court's finding (Opinion, Section A) that Appellants did not provide the contemporaneous written acknowledgement required by IRC § 170(f)(8) (the "CWA") and find Appellants either complied or substantially complied;

2. Reverse the Tax Court's finding (Opinion, Section B) that Appellants did not comply with the baseline documentation requirements of TR §

1.170A-14(g)(5) (the "Baseline Documents") and find Appellants either complied or substantially complied;

3. Reverse the Tax Court's finding (Opinion, Section C) that Appellants did not comply with substantiation requirements of IRC § 1.170A-13(c) (the "Substantiation Requirements") and find Appellants complied or substantially complied;

4. Reverse the Tax Court's determination of the value of the donated easement and return it to the Tax Court for evaluation under the legally required standard;

5. Reverse the Tax Court's imposition of a penalty because (1) it is not supported by a valid valuation, and (2) the IRS failed to produce supporting evidence in discovery or in compliance with the 14-day rule of the Standing Pretrial Order.

## II. JURISDICTIONAL STATEMENT

### A. Agency Jurisdiction.

The IRS issued a notice of deficiency on August 21, 2015, assess additional tax, interest and penalties for 2010, 2011 and 2012. (JA201-216). Appellants filed a timely petition for redetermination. (JA10-19). The Tax Court had subject matter jurisdiction pursuant to IRC. § 6213(a).

**B.** **This Court's Jurisdiction And Venue.**

This Court has subject matter jurisdiction under IRC § 7482(a)(1). Venue is proper as Appellants are residents of the State of Virginia, which is within this Circuit. IRC § 7482(b)(1)(A).

**C.** **Timeliness of Appeal.**

The Tax Court's Judgment was issued on December 21, 2022. (JA2212). Appellants filed a timely Notice of Appeal on Monday, March 20, 2023. (JA2223-2224).

**D.** **Finality Of Underlying Decision.**

This Appeal is taken from a final judgment holding Appellants liable for additional tax assessments, interest and penalties. (JA2212).

## III. STATEMENT OF ISSUES FOR REVIEW

1. Did the Tax Court err in finding the Conservation Easement Deed between Appellants and Liberty County did not satisfy the requirement for a CWA?

2. Did the Tax Court err in finding the baseline documentation provided to Liberty County was inadequate over Liberty County's certification?

3. Did the Tax Court err in finding Appellants failed satisfy the substantiation requirements because they disclosed their basis in the full property, as opposed to the easement parcel?

4.      Did the Tax Court err in accepting an IRS's valuation methodology that measured the value of their property against properties that had a different "highest and best" use?

5.      Did the Tax Court err in assessing a 40% underpayment penalty:

   a.      Because it erred in its valuation assessment; and/or

   b.      The IRS did not provide Appellants with evidence of the supervisor approval required by IRC § 6751(b)(1) in discovery or in compliance with the Standing Pretrial Order?

Appellants contend the answer to each of these is Yes.

## IV.    STATEMENT OF THE CASE

### A.    Statement of Operative Case-Specific Facts.

Appellants are the owners and sole members of The Kenneth Brooks & Anita Wolke Brooks Family LLC (the "Family LLC"). (JA196). On December 15, 2006, the Family LLC purchased 85.35 acres of real property (the "Property") in a private development located in Liberty County, Georgia, called Hampton Island. The purchase price was $1,350,000.00. (JA196-197).

On December 15, 2006, Appellants divided the Property into two parcels, one consisting of 44.113 acres and one of 41.201 acres.[8] (JA197). Appellants also obtained permission of the developer of Hampton Island to further subdivide the

_____

[8] For simplicity, Appellants will refer to these as the "44-acre Parcel" and the "41-acre Parcel."

Property into 2-acre parcels. (JA398-399). All parties agree the highest and best use of the property was as a residential subdivision. (JA2194).

On December 27, 2007, the Family LLC gave up the right to develop the 41-acre Parcel as a subdivision and granted a conservation easement to Liberty County, (the "Easement"). (JA400-428). Liberty County is a political subdivision of Georgia and is a qualified organization under I.R.C. § 170 (h)(3). (JA198).

The Easement was conveyed by a conservation easement deed prepared by Dan Landis, Esq., counsel for the Family LLC (the "Deed"). (JA400-428). In it, the Parties acknowledged the property was being **donated** by Appellants:

> WHEREAS, the Grantee acknowledges that the Grantor has agreed to **convey and donate** the Conservation Easement to the Grantee as set forth herein.

(JA402).

The Deed included a legal description of the Easement (JA419-420), a detailed survey depicting the Easement (JA420), and a plat depicting the features of the Easement, which, contrary to the Tax Court's findings, includes the access road going through the Easement and the placement and size of the wetlands being protected. (JA422). The Deed also attached a Baseline Survey Summary that included the baseline documents provided to the Liberty County at the time of the Easement (the "Baseline Documents"). (JA423-428).

The Baseline Documents were prepared by Frank McIntosh, Southeast Conservation Planner, Georgia Land Trust, Inc. They reference the Deed and describe: (1) the Easement size and location, (2) the previous and current use of the property, (3) the surrounding roads and access points, (4) the improvements on the property, (5) the hydrology of the Property, (6) geological characteristics of the property, (7) the absence of other easements, (8) the types of soils on the property, (9) the ecological features of the property, and (10) the public benefit that was to be preserved. (JA423-428). Liberty County acknowledged receipt of the Baseline Documentation and compliance with TR § 1:170A-14(g)(5), the regulation requiring Appellants to provide the Baseline Documents to the donee organization. (JA434).

Appellants engaged James R. Clower, Sr., a certified real estate appraiser, to appraise the value of the easement donation (the "Appraisal"). (JA447-571). At trial, the IRS conceded the Appraisal was a qualified appraisal, rendered by a qualified appraiser, as required by the applicable Regulations, and duly attached to the return:

> 21. Respondent does not challenge that the Family LLC attached a qualified appraisal by a qualified appraiser to its 2007 Form 1065 as required by I.R.C. § 170(f)(11)…

(JA198). (*See* IRC § 170(f)(11)).

The Appraisal specifically noted the entire 85.14-acre tract was purchased for $1,350,000 and the Easement at issue related only to a portion:

> The subject property was purchased by Kenneth Brooks & Anita Wolke Brooks Family, LLC on December 15, 2006 for the amount of $1,350,000 from Hampton Island, LLC. **The purchase included the entire 85.314 acre tract of which the subject is a portion**.

(JA467) (emphasis added).

As required by TR § 1.170A-14(h)(3)(i), the Appraisal valued both the diminution in value to the 41-acre Parcel and the associated increase in value to the 44-acre Parcel. (JA453). Taking both into account, Mr. Clower concluded the final estimated fair market value of the contribution was $5,100,000 – calculated with respect to the Property as a whole. (JA453). Based on Mr. Clower's detailed 125-page Appraisal, Appellants claimed a $5,100,000 charitable contribution. (JA437, JA440).

The Family LLC submitted the Appraisal with a Form 1065 U.S. Return of Partnership Income and Form 8283 describing the donated property. (JA198, JA435-446). Among other things, the Appraisal described the Property and the Family LLC's basis in the Property as follows:

> The subject property was purchased by Kenneth Brooks & Anita Brooks Family, LLC on December 15, 2006 for the amount of $1,350,000 from Hampton Island, LLC. **The purchase included the entire 85.314 acre tract of which the subject is a portion.**

(JA467) (emphasis added).

> The subject property is a vacant tract of land totaling 41.201 acres. The tract is a portion of a larger 85.314 acre parcel of land. A conservation Easement has been placed on the subject 41.201 acres, leaving the remaining 44.113 acres of the original tract with development rights.

(JA456, JA459).

The Form 8283 was also prepared by Mr. Clower. (JA440). It described the donated property as a "41.201 Acre Tract of Vacant Land" and indicated that the deduction claimed was $5,100,000. (JA440). When listing the "Donor's cost or adjusted basis," Mr. Clower listed the acquisition price for the full Property of $1,350,000.00. (JA440). At trial, Appellants presented evidence indicating that, to the extent this was an improper statement of the basis (because it was the basis in the whole Property, as opposed to a calculation of basis for the 41-acre Parcel), it was an error. (JA2206).

The Family LLC's Form 1065 Tax Return was prepared by its accountant, Bonnie J. Dennis. (JA435). Appellant Ken Brooks, M.D. ("Dr. Brooks"), testified that Ms. Davis had been his accountant for at least 20 years, that she had no issues with respect to the conservation easement, and that this was the first and only conservation easement donation he has made. (JA1655). When asked about one of the document requirements challenged by the IRS, Dr. Brooks testified as follows:

> I relied on the professionals. People come to me [as a doctor]. They rely on my knowledge and my experience. Exactly what I did with this. I relied on my attorneys, relied on my tax preparer, Bonnie Davis[,] and was assured this was all above board.

(JA1653). This testimony was not disputed or questioned on cross examination. (JA1656-1660).

On August 21, 2015, the IRS issued a notice of deficiency for 2010, 2011 and 2012. (JA195-196, JA201-216). For 2010, it sought $212,181.00 in tax, $84,530.80 in penalties, and interest (compounding daily). For 2011, it sought $262,260.00 in tax, $104,904.00 in penalties, and interest (compounding daily). For 2012, it sought $252,885.00 in tax, $101,154.00 in penalties, and interest (compounding daily). (JA201).

Appellants timely challenged the deficiency on November 5, 2015. (JA10-19). Although it was an element of the IRS's case in chief, the IRS did not provide Appellants with evidence that it had obtained the written approval of a supervisor to impose a penalty during discovery. (JA1876).

On April 26, 2017, the Tax Court issued its Standing Pretrial Order for the relevant trial session of September 25, 2017. (JA70-72) (the "Standing Order"). The Standing Order required each side to identify and exchange all documents it intended to use 14 days before trial and warned failure to comply could result in exclusion of evidence. (JA71).

In pretrial briefs, the IRS asserted multiple technical violations of the applicable rules, alleged the Easement had been grossly overvalued and requested penalties. (JA652). Appellants opposed all arguments. (JA667-687)

On September 20, 2017, seven days before the trial, the IRS provided Appellants with a document purporting to reflect the supervisory approval for imposition of the 40% accuracy penalty. (JA1876). It did not produce the supervisory approval in discovery or in compliance with the Standing Order. (JA1876-1877).

Trial was held on September 27, 2017. The Parties submitted Post-Trial Opening Briefs on February 13, 2018 (JA1882, JA1983) and Post Trial Answering Briefs on April 16, 2018. (JA2080, JA2121).

Four and a half years later, the Tax Court issued T.C. Memo 2022-122, affirming the Commissioner's Deficiency Notice in its entirety. (JA2190-2211). Appellants filed a timely appeal. (JA2223-2224).

## V.    SUMMARY OF ARGUMENT

At the invitation of Congress, Appellants made a contribution of conservation property in perpetuity to a qualified organization, relying on qualified lawyers, accounts and land planners to ensure the contribution was proper and was properly documented. Although Appellants believe the documentation complied (and certainly substantially complied) with the law's nuanced requirements, in the time since their donation, the IRS and the Tax Court have increasingly weaponized the rules to restrict conservation easements. At the request of the IRS, the Tax Court disallowed Appellants' deductions under three of the weaponized rules and

rejected their valuation expert's opinion in favor of a legally impermissible valuation supplied by the IRS and imposed a 40% penalty. The documentation rulings were made in error because they ignored Appellants' compliance and held them to a standard that was not announced at the time. The valuation was error because it violated the controlling law. The penalty was erroneous because it was premised on an incorrect valuation and ignored the IRS clear violation of the Tax Court rules.

## VI. ARGUMENT AND CITATION TO AUTHORITY

### A. Standard Of Review.

Tax Court decisions are reviewed under the standards applied to civil bench trials in the District Courts. *Waterman v. Comm'r*, 179 F.3d 123, 126 (4th Cir. 1999). Questions of law, including statutory interpretation, are reviewed under a *de novo* standard. Findings of fact are reviewed for clear error. *Id.*

### B. The Tax Court Erred In Finding There Was No CWA.

The Tax Court disallowed Appellants' Carry Forward Deductions, finding they were not supported by the contemporaneous written acknowledgement required by IRC § 170(f)(8). This was error. The Deed satisfied the CWA requirements of IRC § 170(f)(8).

### 1. The Law And The Tax Court's Retroactive Application Of Improper Technical Standards.

IRC § 170(f)(8) states, in relevant part:

> **(2)** General rule.—No deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B).
>
> (B) Content of acknowledgement.—An acknowledgement meets the requirements of this subparagraph if it includes the following information:
>
> **(2)** The amount of cash and a description (but not value) of any property other than cash contributed.
>
> (ii) Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i).
>
> (iii) A description and good faith estimate of the value of any goods or services referred to in clause (ii) or, if such goods or services consist solely of intangible religious benefits, a statement to that effect.

*Id.*

IRC § 170(f)(8) does not require that a CWA take a particular form. *Id.* To the contrary, Congress intended that parties be free to use any type of form and provided an open range of examples of what could be acceptable:

> The provision requires that the written acknowledgment provide information sufficient to substantiate the amount of the deductible contribution, **but the acknowledgment need not take any particular form.** Thus, for example, acknowledgments may be made by letter, postcard, or computer-generated forms.

*Omnibus Budget Reconciliation Act of 1993*, 1993-3 C.B. 393 (I.R.S. 1993), Senate Amdt. To House Bill at Note 32 (emphasis added).[9]  While Congress has amended IRC § 170 thirty-one times since 1993, it has not amended this language. Similarly, while the Secretary of the Treasury (the "Secretary") had authority to implement more detailed requirements, it did not. (TR § 1.170A-13 (in effect through 2018)).

The provision of a CWA is part of the substantiation requirements Congress established for charitable deductions. (*See, Simmons v. Comm'r*, 98 T.C.M. (CCH) 211 (T.C. 2009), *aff'd*, 646 F.3d 6 (D.C. Cir. 2011) (Including the requirements of IRC § 170(f)(8)(A) in its discussion of substantiation requirements).  At the time of the events in question (initial deduction, 2007; carry forward deductions, 2010-2012), caselaw from both Tax Court and Article III Courts allowed a deduction if the taxpayer "substantially complied" with the substantiation requirements:

> Under the above test we must examine section 170 to determine whether the requirements of the regulations are mandatory or directory with respect to its statutory purpose. At the outset, it is apparent that the essence of section 170 is to allow certain taxpayers a charitable deduction for contributions made to certain organizations. It is equally apparent that the reporting requirements of section 1.170A–13, Income Tax Regs., are helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed. However, the reporting requirements do not relate to the substance or essence of whether or not a charitable contribution was actually made.

---

[9] Indeed, the CWA requirement may be satisfied by a series of documents. *Irby v. Comm'r*, 139 T.C. 371, 389 (2012).

> We conclude, therefore, that the reporting requirements are directory and not mandatory. *See Taylor v. Commissioner*, supra at 1078–1079.

*Bond v. Comm'r*, 100 T.C. 32, 41 (1993); *See also*, *Hewitt v. Comm'r*, 109 T.C. 258, 263 (1997), *aff'd,* 166 F.3d 332 (4th Cir. 1998) (restating the holding of *Bond* as to substantial compliance, but noting that all aspects of the qualified appraisal requirement may not be satisfied by substantial compliance, and that *Bond* cannot be read to *excuse* the statutory requirement for a qualified appraisal).

In keeping with this language, in 2009, two years after the Appellants took their initial deduction for the Conservation Easement, the Tax Court specifically recognized that a conservation easement deed served as a CWA:

> The deeds themselves satisfy the requirements of section 170(f)(8)(A) and (B), as they are signed by a representative of L'Enfant, are contemporaneous with the donation of the easements, and describe the properties donated. The deeds were also obtained before petitioner's returns were due.

*Simmons*, 98 T.C.M. 211 at *7.  *Id.*  Notably, there was no articulation of a requirement that the deed have an "entire agreement" provision to qualify as a CWA – as the Tax Court found in this case. *Id.*

Accordingly, as of 2007, the date Appellants took their deduction and had to have their CWA, American taxpayers seeking to make charitable deductions had been informed by Congress that a CWA did not need to take any particular form and by the Tax Court that substantial compliance with the CWA was all that was needed.  As of 2009, the year before the first of the three carry forward deductions

at issue, taxpayers had been informed by the Tax Court that conservation easement deeds could serve as CWAs.

In 2012, five years after Appellants obtained the Deed they contend serves as a CWA in this case, the Tax Court issued *Averyt v. Comm'r*, 104 T.C.M. (CCH) 65 (T.C. 2012). Although there was no relevant change in the Revenue Code or the Regulations, *Averyt* held substantial compliance did not apply to the substantiation requirements of IRC § 170(f)(8)(B):

> The doctrine of substantial compliance does not apply to excuse compliance with the substantiation requirements of section 170(f)(8)(B). *Durden v. Commissioner*, T.C. Memo. 2012–140.[10]

*Id.* at *4. Of course, even assuming *Averyt* constitutes notice of a change to the public, it was five years too late for Appellants to obtain a different *contemporaneous* written acknowledgement.

Moreover, *Averyt* reaffirmed *Simmons'* holding that a conservation deed could serve as a CWA. *Averyt* at *4. While it pointed out that *Simmons* had not addressed the requirement that a donor obtain a CWA stating that it "did not obtain anything in exchange" and noted that the deed in question had additional features,

---

[10] While the Court cited *Durden* in support of this, *Durden*, decided months before, held that the taxpayer had not strictly **or substantially** complied. It did not hold substantial compliance was not available to satisfy IRC §170(f)(8)(B). (*Id.* at *4 "Petitioners have failed strictly **or** substantially to comply with the clear substantiation requirements of section 170(f)…") (emphasis added).

making it even more appropriate to serve as a CWA, it did not state those features

were required:

> The Court [in *Simmons*] noted that the deeds were signed by a representative of the donee organization, were contemporaneous with the donation, and described the easement donated. *Id*. Similarly, in the instant case, the conservation deed was signed by a representative from WAT, provided a detailed description of the property and the conservation easement, and was contemporaneous with the contribution. **Additionally, the conservation deed in the instant case states that the conservation easement is an unconditional gift, recites no consideration received in exchange for it, and stipulates that the conservation deed constitutes the entire agreement between the parties with respect to the contribution of the conservation easement.** Accordingly, the conservation deed, taken as a whole, provides that no goods or services were received in exchange for the contribution. Consequently, we conclude that, as in Simmons, the conservation deed in the instant case satisfies the substantiation requirements of section 170(f)(8).

*Id.* at *5 (emphasis added).

Four years later, in *French v. Comm'r of Internal Revenue*, 111 T.C.M.

(CCH) 1241 (T.C. 2016), the Tax Court held the CWA requirement may be

satisfied if the deed, **as a whole**, proves compliance with § 170(f)(8)(B)(ii):

> The above analysis demonstrates that when a deed of conservation easement does not explicitly state whether the donee provided goods or services in exchange for the charitable contribution, the deed taken **as a whole** must prove compliance with section 170(f)(8)(B)(ii). *RP Golf, LLC v. Commissioner*, at *10–*11; *Averyt v. Commissioner*, slip op. at 12–13. As described in *Averyt* and *RP Golf, LLC*, factors that support compliance are that the deed recites no consideration other than the preservation of the property and that the deed contains a provision stating that the deed is the entire agreement of the parties.

*Id.* at *4 (emphasis added).  Here again, consistent with the flexibility envisioned by Congress, the Court's focus was properly on the interpretation of the deed as a whole, not formulaic requirements or a specific form.  The existence of an entire agreement clause was just one of the ways compliance with § 170(f)(8)(B) might be demonstrated.

The Court below took the progression one step farther, which was too far. Citing to two cases that followed *French*, it concluded that a deed that was silent as to consideration[11] **must** have an entire agreement provision to satisfy the requirements of § 170(f)(8)(B):

> In other words, silence in a deed serves as the CWA that the donee provided no goods or services as consideration, in whole or in part, **only if** the deed also qualifies that the terms of the deed are the entire agreement. *See Big River Dev., L.P. v. Commissioner*, T.C. Memo. 2017-166; *310 Retail, LLC v. Commissioner*, T.C. Memo. 2017-164.

(JA2200) (emphasis added).  The Court reached this conclusion despite there being no evidence of consideration. (JA2190-2211).

Putting aside the retroactive application to Appellants (almost 15 years after they obtained their CWA), this was error for several reasons.  First, it purports to establish a formulaic requirement for an "entire agreement" clause when neither Congress, the Secretary nor the Courts have previously alerted the donating

---

[11] While Appellants' Deed referred to $10 dollars and other good and valuable consideration, the Court properly recognized that this was boilerplate language that did not impact the analysis.  (JA2191).

American public such a requirement applies. Second, it represents the Tax Courts' acceptance of agency overreach by the IRS. Although they have made many changes to the relevant laws and regulations, Congress and the Secretary have steadfastly left the CWA requirement flexible and as initially drafted for 30 years. The IRS does not have the authority to impose an interpretation that goes against the will of Congress and the Secretary, and the Tax Court does not have the authority to accept such an interpretation. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842–43 (1984) ("…for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

### 2. The Proper Analysis Highlights The Tax Court's Error.

What the Tax Court should have done is what was done in *Simmons, Averyt* and *French*. Rather than formulaically focusing on the existence of an entire agreement clause, the Court should have looked to the Deed as a whole to see if it established that Appellants received no consideration in exchange for their donation. Had the Court done so, it would have recognized the Deed served as a CWA.

When applying a federal revenue act, state law determines the nature of the legal interest the taxpayer had and the meaning of the instrument conferring its rights. *Helvering v. Stuart*, 317 U.S. 154, 162 (1942) ("Congress has selected an event, that is the receipt or distributions of trust funds by or to a grantor, normally

brought about by local law, and has directed a tax to be levied if that event may occur. Whether that event may or may not occur depends upon the interpretation placed upon the terms of the instrument by state law.); *United States v. Nat'l Bank of Com.,* 472 U.S. 713, 722 (1985); *McClurg Fam. Farm, LLC v. United States*, 115 Fed. Cl. 1, 6 (2014) ("Questions involving the interpretation of these documents must be resolved by reference to state law, in this case, that of Iowa.")

Here, the deed conveys Georgia property. As such, it is controlled by and must be interpreted pursuant to Georgia law. *Sims v. Jones*, 158 Ga. 384, 123 S.E. 614, 617 (1924) ("So we are of the opinion that the present contract is to be construed according to the lex loci rei sitæ, or according to the law where the property is located, in the present instance in the state of Georgia.").

Under Georgia law, words in a deed are to be given their ordinary meaning. *Atlanta Dev. Auth. V. Clark Atlanta Univ., Inc.,* 298 Ga. 575, 579, 784 S.E.2d 353, 357 (2016); *Lafarge Bldg. Materials, Inc. v. Thompson*, 295 Ga. 637, 640, 763 S.E.2d 444, 446–47 (2014). Moreover, Courts are to avoid constructing deeds in a manner that renders provisions superfluous. *Freeport Title & Guar., Inc. as Tr. Of 1080 Bethlehem Church Tr. V. Braswell*, 367 Ga. App. 123, 126, 885 S.E.2d 73, 76 (2023) ("Freeport's reading of the security deed would impermissibly render that provision superfluous, given the immediately preceding dragnet clause.")

The Deed makes it clear that Appellants "donated" the property to Liberty County:

> WHEREAS, the Grantee [Liberty County] acknowledges that the Grantor [the Family LLC] has agreed to convey and **donate** the Conservation Easement to the Grantee as set forth herein.

(JA402) (emphasis added). "Donate" and its derivatives have a well-defined and well-known meaning that cannot be reconciled with the Opinion. Black's Law Dictionary defines "donate" as:

> donate *vb.* (18c) To give (property or money) **without receiving consideration** for the transfer…

DONATE, Black's Law Dictionary (11th ed. 2019) (emphasis added). Georgia Courts have defined "donation" as:

> Webster defines donation as 'that which is given as a present, a gift. A voluntary transfer without consideration,' and defines gratuity, as 'something given freely, or without recompense, **a free gift**, a present.' Bouvier's Law Dictionary defines donation as 'A gift. * * * The act by which the owner of a thing voluntarily **169 transfers [the same] **without any consideration**;' and defines gratis, as 'without reward or consideration.' 1 Bouv.Law Dict., Rawle's Third Revision, p. 924.

*State Highway Dep't of Georgia v. Bass*, 197 Ga. 356, 369, 29 S.E.2d 161, 168–69 (1944) (emphasis added).

The Tax Court was required to: (1) recognize that there was no particular form required to satisfy the CWA requirement; (2) avoid formulaic requirements; and (3) look to the Deed as a whole to see if it satisfied the CWA requirements of

IRC § 170(f)(8). The only requirement in dispute was whether the Deed showed Appellants did not receive consideration in exchange for their charitable contribution. This was shown by language that clearly and unequivocally demonstrated the transfer was a donation, meaning, by definition, it was made without any consideration. This conclusion was further affirmed by Dr. Brooks' testimony (JA1654) and by the absence of any evidence of consideration flowing to Appellants. (JA1624-1881). As such, the Court's rejection of Appellants' deduction for failure to provide a CWA was error and must be reversed.

### C. The Tax Court Erred In Finding Appellants Failed To Comply With The Baseline Documents Requirements Of TR § 1.170A-14(g)(5).

The Tax Court disallowed Appellants' Carry Forward Deductions finding that, despite a certification from Liberty County, Appellants failed to provide Liberty County with "adequate" baseline documentation. This was error because (1) the Baseline Documentation provided was approved by Liberty County, the organization the Secretary tasked with deciding what documents were necessary to police and enforce the Easement, and (2) the Baseline Documentation satisfied all previously announced requirements of TR § 1.170A-14(g)(5).

#### 1. The Relevant Law.

Charitable donations of conservation easements are somewhat unique in that Congress has encouraged landowners to make donations by restricting the use of

their property into perpetuity, while still retaining ownership of the property. IRC § 170(h)(1)(c). To ensure donors do not use the rights they retained for themselves in way that damages the conservation restrictions, the Secretary adopted TR § 1.170-14(g)(5), which establishes a regulatory scheme by which the donee organization is charged with policing the easement.

TR § 1.170-14(g)(5) creates an elegant balance. It requires the donor to provide the donee with the documentation the donee believes is needed to police the easement, while leaving the types of documents that may be used flexible.[12] It requires the donor and the donee to certify the documents are adequate.[13] And, it provides the donee organization with the tools it needs to enforce the easement.[14]

---

[12] "...**the donor must <u>make available</u> to the donee,** prior to the time the donation is made, documentation sufficient to establish the condition of the property at the time of the gift. Such documentation is designed to protect the conservation interests associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of the reserved rights. Such documentation **<u>may</u>** include:…." *Id.* (emphasis added)

[13] "The documentation, including the maps and photographs, must be accompanied by a statement signed by the donor and a representative of the donee clearly referencing the documentation and in substance saying "This natural resources inventory is an accurate representation of [the protected property] at the time of the transfer." *Id.*

[14] "**(ii) Donee's right to inspection and legal remedies.** …the donor must agree to notify the donee, in writing, before exercising any reserved right… The terms of the donation must provide a right of the donee to enter the property at reasonable times for the purpose of inspecting the property to determine if there is compliance with the terms of the donation. Additionally, the terms of the donation must provide a right of the donee to enforce the conservation restrictions by appropriate legal proceedings…" TR § 1.170A-14(g)(5)(ii) (emphasis added).

In so doing, it gives the donee (that is familiar with what is being donated) whatever documents it believes it needs to monitor the easement and the legal ability to do so, while at the same time giving the donor assurance that it has provided the requisite documents and will not be subsequently penalized for alleged improper documents. As TR § 1.170-14(g)(5) contemplates enforcement by the donee organization, TR § 1.170-14(g)(5) does not require the donor or the donee to provide the baseline documents to the IRS. *Id.*

**2.    The Tax Court Erred In Allowing The IRS To Insert Itself Into Process Established By TR § 1.170A-14(g)(5).**

As seen from review of the statutory scheme behind conservation easements, Congress and the Secretary carefully dictated roles for the various players in the process. Nothing about TR § 1.170A-14(g)(5) contemplates or creates an active role for the IRS in either dictating the baseline documents supplied to the donee or second guessing that which has already been approved by the donee. Certainly, nothing contemplates that a third-party IRS agent who was not involved in the back and forth between the donor and the donee, is not familiar with the property donated, may not know anything about its conservation purpose, may have no experience in assessing what is necessary to monitor a conservation easement, and may be looking at it years later, will have authority to *subjectively* decide the documentation a qualified donee organization certified as adequate, was not.

It was error to for the Tax Court to allow the IRS to assume this role. Indeed, given that TR § 1.170A-14(g)(5) establishes a flexible approach to the documentation made available to the donee organization and does not establish any specific documentary requirements that would give a taxpayer assurance it has complied, giving the IRS the authority to second guess the donee's certification would be incredibly chilling. Public perception is that the IRS has openly indicated a hostility toward conservation easements and will attack them whenever possible. If the IRS is able to set subjective standards, *ex post facto,* for what must be provided and penalize donors for not supplying documents they never knew they had to supply, no potential donors will ever make donations and Congress' intent will be upended.

This is exactly what the Fifth Circuit observed in talking about the very baseline requirements at issue -- and bears repeating in context here:

> Appellants claim that the Tax Court in this case is the first ever to disallow a deduction for the contribution of a conservation easement based on the inadequacy of the "baseline documentation," and the Commissioner cites no authority to the contrary. Such a holding contradicts the very language of the provision which states that the baseline documentation may include these on the list of potential documents, indicating that a flexible approach on documentation is appropriate. The Tax Court's hyper-technical requirements for baseline documentation, if allowed to stand, would create uncertainty by imposing ambiguous and subjective standards for such documentation and are contrary to the very purpose of the statute. If left in place, that holding would undoubtedly discourage and hinder future conservation easements. NALT had documentation before it that was more than sufficient to establish the condition of the property

prior to the donation of the conservation easement. The Tax Court clearly erred in finding to the contrary.

*BC Ranch II, L.P.* 867 F.3d at 556.

The obvious problems with providing an advocate like the IRS with such a weapon are likely why the IRS never challenged baseline documentation until *BC Ranch II* – decades after TR § 1.170A-14(g)(5) was adopted. Indeed, given that the IRS has no role in the future policing of easements and, under the system established by Congress and the Secretary, would have already received the substantiation and other documents necessary to verify the donation and its value, the only possible reason the IRS would have for challenging baseline documents would be to chill conservation easements and disallow easements it could not defeat on other grounds. This requires reversal.

### 3. The Baseline Documents Were Adequate And The Court Erred In Finding Otherwise.

Even if the IRS were deputized to challenge the Baseline Documentation Liberty County certified as adequate, the documents *were* adequate and the Court's finding otherwise was error.

As outlined in the Statement of Facts, Appellants provided Liberty County with a robust set of documents describing the Easement and relevant conditions and Liberty County certified receipt and accuracy of the documents. While it is true the Baseline Documents did not include every possible document that might

have been provided, there is no requirement for that. To the contrary, the Regulation is intentionally flexible. TR § 1.170A-14(g)(5) (…Such documentation **may** include:….") (emphasis added).

Moreover, while the Tax Court found the documents were inadequate, it did so (at the urging of counsel for the IRS) without any evidence to support the IRS's position. The Tax Court did not visit the Easement and compare the Baseline Documents to what it saw and did not take testimony on the question of whether the Baseline Documents were adequate for Liberty County to police the use of the Easement. Rather, it appears to have simply decided, as a matter of law, without looking at the Easement, that the documentation was inadequate. It is axiomatic that this unsupported finding was error. *United States v. McRae*, 77 F.2d 88, 89 (4th Cir. 1935) ("A verdict must be based on evidence, not on speculation or conjecture.")

Moreover, the Tax Court appears made significant mistakes in its view of the documents. It held there was no survey because it was not attached to the Baseline Report (JA2203); but failed to recognize that the Deed itself contained two surveys that Appellants provided to Liberty County. (JA421-422).[15] It held there was not an adequate description of the road that traversed the Easement

---

[15] Baseline documents need only be made available to the done organization. TR § 1.170(14(g)(5). There is no requirements that they be collected into a document titled Baseline Report. *Id.*

because it was not depicted in the Baseline Report (JA2203); but failed to consider that the Deed contained two surveys depicting the road precisely and to scale. (JA421-422). It held there was inadequate description of the wetlands because they were not mapped on the Baseline Report (JA2203); but failed to recognize that the wetlands were specifically mapped on the second survey included with the Deed. (JA422). It held the description of the vegetation was inadequate because it merely stated: "[m]uch of the property is now grassy pasture. There are isolated hardwoods throughout the interior of the property." (JA2203). However, it had no evidence indicating that this was not an adequate and appropriate description.

The Tax Court also appears to have made a significant error in its review of the regulatory requirements. It was highly critical of the Baseline Report because it required Appellants to alert Liberty County if they intended to exercise any of their reserved rights:

> The requirement that the property owner alert Liberty County to any exercise of the reserved rights is insufficient; it relies on the property owner to police itself when it is precisely their actions which the baseline requirement is intended to police.

(JA2204). However, it failed to appreciate this was precisely the requirement of the regulation. TR § 1.170-14(g)(5)(ii) ("In the case of any donation referred to in paragraph (g)(5)(i) of this section, the donor must agree to notify the donee, in writing, before exercising any reserved right…."). In other words, the Tax Court

disallowed the deduction, at least in part, because Appellants **complied** with the regulations.

Finally, the Tax Court erred in failing to recognize that, even if the Baseline Documentation was not "perfect," Appellants substantially complied with the relevant requirements. *Bond,*100 T.C. at 41. As evidence of this, Liberty County certified that the documents were received and accurate. (JA0434).

Each of these errors was material. Each requires reversal.

**D.     The Tax Court Erred In Finding Appellants Failed To Meet The Substantiation Requirements Of TR § 1.170A-13(c)(2)(ii).**

The Tax Court found Appellants failed to satisfy the substantiation requirements of IRC § 1.170A-13(c)(2). Although the Opinion is not entirely clear as to what Appellants did wrong, it appears to hold that Appellants violated the requirements because the Form 8283 completed by their appraiser and filed with their tax returns stated the basis for the full Property, as opposed to estimating a basis for the 41-acre Parcel where the Easement was placed.[16] This was error.

**1.     The Relevant Law.**

TR § 1.170A-13(c)(2) imposes three substantiation requirements:

(2) Substantiation requirements—(i) In general. Except as provided in paragraph (c)(2)(ii) of this section, a donor who claims or reports a

---

[16] As Appellants purchased the Property as a whole and did not acquire the 41-acre Parcel by a transaction with a third party, all that Appellants could have done is estimated the basis. As property is inherently unique, whatever estimate they provided would have opened them up to an accuracy challenge by the IRS.

deduction with respect to a charitable contribution to which this paragraph (c) applies must comply with the following three requirements:

(A) Obtain a qualified appraisal (as defined in paragraph (c) (3) of this section) for such property contributed. If the contributed property is a partial interest, the appraisal shall be of the partial interest.

(B) Attach a fully completed appraisal summary (as defined in paragraph (c) (4) of this section) to the tax return (or, in the case of a donor that is a partnership or S corporation, the information return) on which the deduction for the contribution is first claimed (or reported) by the donor.

(C) Maintain records containing the information required by paragraph (b) (2) (ii) of this section.

*Id.*

As with the CWA requirements, at the time Appellants took their deduction, the guidance from the Courts was that substantial compliance was what was required. *Bond*, 100 T.C. at 41; *Hewit*, 109 T.C. at 263. Indeed, as recently 2018, the Tax Court rendered an opinion indicating that substantial compliance with the basis requirements of TR 1.170A-13(c)(2) **was** satisfactory. *Belair Woods, LLC v. Comm'r of Internal Revenue*, 116 T.C.M. (CCH) 325 (T.C. 2018) (discussing the basis requirement of TR § 1.170A-13(c)(2) as follows: "In assessing whether Belair substantially complied with the regulations in question here, we consider

whether it provided sufficient information to enable the IRS "to evaluate the[ ] reported contributions, as intended by Congress.").[17]

2. **The Court Erred Because Appellants Complied With A Proper Reading Of The Rules Relating To Provision Of Basis.**

Although the Opinion is not specific, the regulatory language the Court appears to have based this aspect of its ruling on is in TR. § 1.170-13(c)(4), which requires a taxpayer to provide the summary appraisal on the form prescribed by the IRS -- Form 8283. (Opinion, p. 5). Specifically, the Court held Appellants submitted an erroneous Form 8283 because they stated the basis for the full Property, as opposed to the 41-acre Parcel. This was error.

It is "[a] fundamental principle in our legal system ... that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012). Nothing about Form 8283 tells a taxpayer what to do in the circumstances of this case, where the taxpayer: (1) buys a larger parcel of land, (2) subdivides it into two parcels, (3) puts an easement on one parcel that benefits the other, and (4) is required to appraise and report, not just the loss in value the easement causes to the encumbered parcel, but the increase in value to the unencumbered parcel. TR §

---

[17] Two years later, in *Oakhill Woods, LLC v. Comm'r of Internal Revenue*, 119 T.C.M. (CCH) 1144 (T.C. 2020), the Tax Court introduced further uncertainty by finding that strict compliance applied to the requirement to provide cost basis.

1.170A-14(h)(3)(iii).   The relevant aspect of the 2007 Form 8283 completed by

Appellants appraiser is:

| (d) Date acquired by donor (mo., yr.) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) For bargain sales, enter amount received | | (h) Amount claimed as a deduction | (i) Average trading price of securities |
|---|---|---|---|---|---|---|
| A  13/15/06 | PURCHASE | 1,350,000 | | | 5,100,000 | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |

**Part II**   Taxpayer (Donor) Statement—List each item included in Part I above that the appraisal identifies as having a value of $500 or less. See Instructions.

(JA440).

The instructions to Form 8283 do not provide any assistance. (*See*,

Instructions to Form 8283, 2006 Version, available at https://www.irs.gov/pub/irs-

prior/i8283--2006.pdf). To the contrary, the Instructions applicable to Section B,

Part 1, Subpart f (at issue), suggest there may be reasons not to provide basis at all:

> Columns (d)–(f). If you have reasonable cause for not providing the
> information in columns (d), (e), or (f), attach an explanation so your
> deduction will not automatically be disallowed.

(*Id.* at p. 2).

Indeed, while the Court accepted the IRS's contention that basis had to be

reported on the 41-acre Parcel alone, it specifically pointed to the requirement that

the Property be valued as a whole:

> In a case such as this involving a conservation restriction covering
> property that is contiguous to property owned by a donor, "[t]he
> amount of the deduction . . . is the difference between the fair market
> value of the entire contiguous parcel of property before and after the
> granting of the restriction." *Id.* **We therefore must value the
> encumbered and unencumbered parcels combined before and
> after the granting of the easement.**

(JA2209) (emphasis added). Similarly, although this was ten years after Appellants' appraiser completed the 8283, the IRS's expert also treated the Property as a whole:

> Additional specific problems associated with this appraisal assignment are that the easement only encumbers slightly less than half of the property and that it allows equestrian uses.

(JA1339).

> The subject property consists of approximately 85.314 acres of vacant land in an irregular shaped tract.

(JA1346).

Moreover, as noted in *Belaire Woods*, the Tax Court has recently taken the position that the purpose of providing basis is to give the IRS an easy way to compare the basis to the donation value claimed for an easement:

> The requirement to disclose "cost or adjusted basis," when that information is reasonably obtainable, is necessary to facilitate the Commissioner's efficient identification of overvalued property. The cost of property typically corresponds to its FMV at the time the taxpayer acquired it.

*Id.*, 116 T.C.M. (CCH) 325 at *6. If this is the purpose, it certainly seems appropriate and correct, in a case such as this where the value of the Easement includes the full Property, to provide the basis in the full Property so it can be compared to Easement value calculated on the full Property.

Accordingly, Appellants submit they either complied with TR § 1.170A-13(c)(2) or the regulation was not sufficiently clear to put them on notice they needed to do it a different way. Either requires reversal.

### 3. At A Minimum, Appellants Substantially Complied.

Even if it were to be held that Appellants had fair notice of the IRS's future position as to what TR § 1.170A-13(c)(2) required and did not strictly comply, the evidence shows they "substantially complied." This was enough.

In *Belair Woods*, decided 11 years after the deduction and in an already aggressive IRS environment, the Tax Court described the requirements of substantial compliance with the cost basis provisions of TR § 1.170A-13(c)(2) as follows:

> Substantial compliance may be shown where the taxpayer provided most of the information required **or** made omissions solely through inadvertence. But in order to substantially comply, the taxpayer must satisfy those reporting requirements that "relate 'to the substance or essence of the statute. In assessing whether Belair substantially complied with the regulations in question here, we consider whether it provided sufficient information to enable the IRS to evaluate the reported contributions, as intended by Congress.

*Belair Woods,* 116 T.C.M. 325 at *6 (internal citations and case notes omitted) (emphasis added).

Here, the evidence shows Appellants: (1) provided the basis for the entire Property and, in so doing, gave the IRS a true and easy comparison of the cost basis of the Property <u>as a whole</u> to compare to the overall impact the Easement had

on the Property <u>as a whole</u>; (2) explained in the accompanying Appraisal that the basis was from the acquisition of the Property <u>as a whole</u>, and (3) explained the Easement was only on the 41-acre Parcel. (JA478, JA456, JA457, JA459).

Moreover, comparing the cost basis of the Property as a whole to the Easement value shows that the Easement value was 3.7 times as much as the cost-basis. Thus, to the extent the IRS wanted the information to be readily available so it could be alerted when a taxpayer was taking an easement that was for more than the purchase price of the donated item, the IRS certainly got that and certainly got information that satisfied the alleged purpose of the regulation.

While it is true Appellants might have formulated an estimate of a new basis (e.g., by dividing the purchase price by the full 85.314 acres to get a "per acre" price and multiplying that by 41.201), that would not have been factually accurate and would be more open to hyper-technical attack as the manner in which Appellants did it. Indeed, given the vigor with which the IRS has sought to default conservation easements, it would be easy to see the IRS taking the position that because it was subdivided by the Appellants and not acquired through any arms-length transaction, any estimate of the basis in the 41-acre parcel was inaccurate; and disallowing the donation for that reason. By contrast, the way that it was done gave the IRS the full and accurate factual information.

Accordingly, even if Appellants did not strictly comply with TR § 1.170A-13(c)(2) (and they believe they did), the Tax Court should have found substantial compliance. Its failure to do so was error.

### 4. The Tax Court Erred By Failure To Find Reasonable Cause Excused Appellants' Provision Of Basis.

The Tax Court seems to have properly determined that a "reasonable cause" defense can apply with respect to the substantiation requirements of TR § 1.170A-13(c)(2). (JA2205). However, here, it simply discounted the defense and determined the alleged error in basis constituted willful neglect as a matter of law because the basis provided was more than two-times what the Court felt the basis should have been. There is no support for this in the law. The ruling was error.

As held by the Tax Court, a taxpayer may be excused for reasonable cause when the reporting failure "was due to reasonable cause and not to willful neglect." (JA2205) ("If a taxpayer alleges reliance on the advice of an accountant, return preparer, or other tax professional, the taxpayer must show that he 'actually relied on in good faith on the professional's advice.'"). The relevant requirements for basis fall deep within the regulations at TR § 1.170A-13(c)(4)(ii)(C), which is implicated by § 1.170A-13(c)(2)(ii)(B), and do not clearly describe what is to be done in the circumstances at hand. Thus, the question is whether Appellants (who are medical doctors, not lawyers or accountants) had good cause to rely on their professionals' advice with respect to these complex tax regulations.

All of Appellants tax forms and appraisals were prepared and submitted by professionals. The tax forms were prepared by Appellants' accountants (JA217-285, JA286-327, JA328-375, JA435-446). The summary appraisal was prepared by a certified real estate appraiser. (JA447-571). Moreover, at trial, it was undisputed that Appellants relied on these professionals in good faith. (JA1653, *see also,* JA1654-1655, further expanding on Appellants reasonable reliance).

Nevertheless, the Tax Court appears to have conflated reasonable cause with substantial compliance and woodenly concluded that the provision of a basis that was almost two-times what the Tax Court assumed the basis should have been could not be excused by reasonable cause (conflated with substantial compliance):

> We have held that Congress specifically passed DEFRA's heightened substantiation requirements to prevent the Commissioner from having to sleuth through the footnotes of millions of returns. *Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at *20. **We cannot find that, in reporting roughly twice the accurate cost basis, petitioners substantially complied with DEFRA.** *See Loube v. Commissioner*, T.C. Memo. 2020-3, at *22-23. Accordingly, petitioners failed to meet the requirements of Treasury Regulation § 1.170A-13(c)(2)(i), and this is also a basis on which the deduction must be disallowed.

(JA2205) (emphasis added). This does not logically connect.

Given the intricacy of the regulations, Appellants' undisputed reliance on qualified professionals, the fact that Appellants were doctors and not accountants or lawyers, the accuracy of the basis information provided on the Appraisal, the open disclosure that the basis was for the entire Property, the requirement that the

entire Property be considered when assessing the value of the Easement, and the absence of any evidence of bad faith, this finding was error.

**E.    The Court Erred In Accepting The IRS's Valuation Because it Violated The Regulations And Law.**

When it came to valuing the Easement, the parties presented competing valuation experts, who agreed as to most of the critical assumptions, but fundamentally disagreed as to the final steps of the valuation analysis.  The Tax Court adopted the IRS's position, which calculated the value of the Easement on property in a high-end real estate development that all parties agreed had a highest and best use as a residential subdivision, with property that had markedly different highest and best uses (in violation of the law).  Appellants believe this represents clear error.  However, the threshold is not that high.  As the Tax Court's adoption of the IRS's position is contrary to the law established in the regulations, it is subject to *de novo* review and must fail.  The case must, at a minimum, be returned to the Tax Court for further proceedings as to the proper valuation of the conservation easement.

**1.    Standard Of Review Applicable To The Tax Court's Valuation Decisions In This Case.**

Tax Court determinations of fair market value are *typically* reviewed deferentially and affirmed unless the Court finds clear error. *Est. of Godley v. Comm'r*, 286 F.3d 210, 214 (4th Cir. 2002) (citations omitted).  However, as the

Sixth Circuit Court of Appeals has frequently recognized, this standard does not make Federal Appellate Courts a "rubber stamp" for the Tax Court. *Est. of Kaplin v. Comm'r*, 748 F.2d 1109, 1110 (6th Cir. 1984). To the contrary, as this Court has recognized, clear error exists "if, after a review of the **entire evidence**, the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burbage v. Comm'r*, 774 F.2d 644, 646 (4th Cir. 1985), *quoting*, *U.S. v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948).

Here, the standard of review relevant to the valuation error is *de novo*. This is because the error the Tax Court committed was not an error in a decision of fact (i.e., should the Court give credence to this appraiser's opinion over the other's), but an error in the application of law (can the Court accept an appraisal that does not follow the legal requirements).[18] The former is subject to review for clear error. The latter is *de novo*. *Waterman*, 179 F.3d at 126.

Unlike many valuations cases, where valuations can be performed in many ways, the method of valuation of a charitable contribution is dictated by law. TR § 1.170A-1(c)(1) requires the value of a contribution be measured by the fair market value of the donation at the time of the contribution. *Id.* The value must, as a matter of law, reflect the realistic highest and best use of the property. *Mitchell v.*

---

[18] As all agreed the highest and best use was residential subdivision, there was no fact to resolve in assessing what type of property to use as a comparator -- just the law to be applied.

*United States*, 267 U.S. 341, 344-345 (1925); *Stanley Works & Subsidiaries v. Comm'r*, 87 T.C. 389, 400, 1986 WL 22172 (1986).

Here, both sides' experts agreed the realistic highest and best use for the donated property was as a residential subdivision. (JA1324; JA1038-1039; JA2194). However, as will be set forth below, the Tax Court accepted an IRS valuation premised on comparing the (residential subdivision) Property to properties with a markedly different highest and best uses (timber, recreation, personal, unspecified future development). Thus, while Appellants believe the valuation would fail under a clear error standard, the Tax Court's adoption of a legally impermissible valuation methodology is a question for *de novo* review and fails under such review.

## 2. Regulatory Guidance on Valuation.

In calculating the value of an easement at its highest and best use, if there is a substantial record of comparable easement sales, that is to be used to determine the value of the contribution. TR § 1.170A-14(h)(3)(i). If there is not sufficient record of comparable easement sales, "as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers *before* the granting of the restriction and the fair market value of the encumbered property *after* the granting of the restriction…." *Id.* (emphasis added).

If such a before and after comparison is used, "the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed…" TR § 1.170A-14(h)(3)(ii).

### 3.    Facts Relevant To The Condition Of The Property.

The undisputed evidence showed the Property was located within the Hampton Island Development.  (JA197).  The Development boasted golf course, lake and marsh lots, a village center with stables, a general store, a chapel, and an equestrian site. (JA397).  Lot purchasers were required to be members of the Hampton Island Club (JA633; JA1647), which offered a robust list of amenities, including, a spa, stocked fishing ponds, two private sea planes, a fishing boat and dock, 21 acres of paddocks, a horse drawn carriage, horses, a stable, additional lodging for guests, trails, bikes, a hay wagon and electric carts. (JA630-631).  In addition, the Club was in the process of constructing an environmentally sensitive 18-hole golf course (designed by Davis Love, III), an organic farm, garden and barn, an 8-bedroom house with 50-person dining room, a lounge, a Robert Mondavi designed wine cellar and an adult pool.  (JA631-632).  Additional high-end amenities were planned and advertised but not yet started.  (JA631-632).

The Development had tremendous cache. Among other things, Ben Affleck and Jennifer Lopez owned a home, the New York Post described as:

> **J.LO'S LOVE NEST; FIRST PEEK AT $16M MANSION**
> This is the stunning Georgia plantation that Ben Affleck and Jennifer Lopez will soon call home. The lovebirds shelled out $16 million for the 83-acre, waterfront spread on ritzy Hampton Island, 35 miles sough of Savannah…. It was once part of a thriving rice and cotton plantation in the 18th and 19th centuries… Affleck has dreamed of owning a piece of Hampton Island ever since he filmed there with Sandra Bullock for their 1999 flick, "Forces of Nature." Bulloch was so taken by the areas beauty that she has already bought property….

(JA396). Although the IRS challenged some aspects of Property's zoning and access, there was no dispute that the Property was in storied Hampton Island and had access to its facilities. (JA1645-1649).

When it came to the likelihood of more-dense development, the IRS stipulated to the authenticity and admissibility of a letter from the developer, authorizing the Property to be subdivided into 2-acre residential home sites. (JA398-399). In addition, Appellants provided testimony from Luther Davis, county attorney for Liberty County from 2000 through trial. (JA1661). Mr. Davis was involved in approximately 12 conservation easements during the early to mid-2000s (JA1662), was personally involved in Appellants' Easement (JA1663), was familiar with the Development (JA1663), and visited the Property around the time of the easement. (JA1664). When asked about the ability of Appellants to adjust

the zoning to increase permitted density by becoming part of the Hampton Island

PUD,[19] Mr. Davis testified as follows:

> Q. How would Cotton Row Farms [Appellants] go about becoming part of that PUD, or could they?
>
> A. They could. They could submit to the PUD which itself, a series of documents, which constitutes the terms and conditions of occupation and development of the property. They would have to get the consent of the owner of the PUD property and would have to get an estimate as part of that PUD.

(JA1682).

> Q. In your experience as the zoning attorney, or as an attorney familiar with zoning at Liberty County, have you ever seen an instance where a property owner wanted to become part of a PUD of an adjoining property?
>
> A. Yes.
>
> Q. Are there any facts in this case that you know of that would prevent Cotton Row Farms from either getting rezoned from A-1 to A-R residential or becoming part of the PUD of Hampton Island?
>
> A. I'm not intimately familiar with the facts of the case, but absent objection from the landowner or other serious impeding governmental interests, which I'm not aware of, I don't see any reason why it couldn't be annexed as part of the PUD.

(JA1683).

Appellants also presented their deed for the Property (JA1524-1528), which contained an easement giving the Property non-exclusive right to ingress and egress. (JA1527). Notably, the easement allowed access to the entire Property across Jelks Pasture Road, which connected to primary roads within the

---

[19] The Property was in Hampton Island, but alleged by the IRS to be outside the existing Planned Unit Development that allowed for greater density.

Development. (JA421). The easement contained no restrictions prohibiting subdivision. (JA421).

Finally, although Appellants disagree with the conclusion about development of 2-acre parcels, even the IRS's expert admitted that, if the density could not be increased, the Property could be developed into 5-acre lots:

> Legally permissible: As described, the subject is zoned A-1, which allows single and two family dwellings on lots as small as 1 acre and which allows agricultural uses. However, in the existing condition with no public road frontage or access density would be limited to a total of ten lots each of which would have a minimum lot size **of five acres**.

(JA1352) (emphasis added).

### 4. The Experts' Positions.

Both experts agreed the highest and best use of the property was as a residential subdivision. (JA2194). As both experts agreed there were not sufficient sales of substantially similar conservation easements, both experts agreed a before and after comparison was the best approach. (JA2194). However, the experts disagreed on how to calculate the before and after value of the Easement.

Mr. Miller, Appellants' expert at trial,[20] went into detail as to why he believed it was reasonable to conclude that Appellants would be allowed to

---

[20] At trial, Appellants submitted Mr. Miller's appraisal as a more conservative appraisal than the IRS stipulated qualified appraisal submitted by Mr. Clowers'.

subdivide the property into 2-acre lots under the existing PUD. (JA1726-1727).
Based on this conclusion, Mr. Miller adopted an income-based model to measure
the value of the donation and concluded that by restricting the right to develop
essentially 20 lots in the highly attractive Development, Appellants donated value
worth $3,630,000 (after appropriate adjustments and increase in the value of the
contiguous 44-acre parcel). (JA972).  In essence (and somewhat oversimplified),
Mr. Miller looked at the robust record of cost of development and comparable
sales of residential lots *within Hampton Island* to calculate value. (JA1035-1075).
The reason this resulted in a value that was significantly higher than that which
was proposed by the IRS was the residential lots that were sold within Hampton
Island had been sold, not unexpectedly, for a high value. (JA1043-1054, average
lot price before adjustment at JA1054).

The IRS's Expert acknowledged in his expert report, which was adopted as
his testimony (JA1842), that a change in the PUD that increased the allowed
density was "likely feasible" and that Club access would increase the marketability
of the lots:

> It is my understanding that if access were physically improved and the
> subject could be subdivided and developed under existing A-1 zoning
> or under the **likely feasible** rezoning to PUD that the owners of the
> subdivided lots would be required to purchase memberships in the
> Hampton Island Preserve amenity package. Even though this would
> require and additional expenditure above and beyond the purchase
> price for each lot the membership privileges would increase the
> marketability of the lots.

(JA1353) (emphasis added). Indeed, he identified one parcel of property that had been sold within the Development and noted that it had been approved for higher density after the sale:

> At the time of sale the property was included as part of the Hampton Island PUD and was approved and platted for 7 small interior lots, 15 golf course lots, 9 lake lots, 20 mini-farms for a total of 51 subdivided lots. 44.35 acres of the property was in a conservation easement that allows equestrian use including three paddocks and extensive rail fencing, none of which has been developed on the property. **Subsequent to the sale the property was approved for higher density as part of the PUD.**

(JA1357) (emphasis added). Moreover, regardless of whether the Property could be divided into 2-acre lots (as Mr. Miller opined), the IRS Expert admitted the Property could be divided into 5-acre lots. (JA1352).

However, surprisingly, the IRS's Expert rejected the income approach that would measure the value by looking at the economic effect of developing and selling lots. The incongruous reason he gave for this in his report related to agricultural and hunting land and was as follows:

> For property types and markets wherein properties are typically income producing assets that are rented or leased, the Income Approach is utilized. The subject property is not intensively used for agricultural purposes so data regarding agricultural leases is not useful. Properties similar to the subject are often leased for hunting purposes. However, hunting leases typically create only nominal income with short lease terms most often renewed annually. **As such I have not used the Income Approach in the valuation of the subject.**

Therefore, in the valuation of the subject property both "Before" and "After" the conservation easement, **I have relied upon the Sales Comparison Approach**. Additional discussion of the valuation methodology for conservation easements is presented later in this report.

(JA1355). Given that the IRS's Expert had admitted that it was "likely feasible" the Property could be included in the PUD and his recognition that the Property could at least be subdivided into 5-acre lots, it is hard to see this decision as anything other than a means to avoid the robust record of high prices for completed lots in Hampton Island. (*See, e.g.*, JA1043-1054).

The IRS's Expert's analysis went further out of bounds when he applied the sales comparison approach. The IRS Expert presented four properties as "comparators" from which to calculate the value of the Property before the donation of the Easement. (JA1374-JA1391). While two of these alleged comparators were within Hampton Island, **none of them were property that had a highest and best use as residential subdivision.** To the contrary, the highest and best use of the IRS Expert's "comparator properties" was personal use, recreational use, timber, assemblage or some undefined type of "future development."[21] (JA1357, JA1630, JA1363, JA1366). Moreover, none were properties suitable for either 2 or 5-acre subdivision lots.

---

[21] This "future development" could not be more lucrative than personal or recreational use or it would have been listed solely as the highest and best use, as opposed to an alternative to recreation, personal use or timber. (JA1374-JA1391).

This was improper.  Land whose highest and best use is as a residential subdivision, is simply not the same as land that is best used for agriculture, hunting or similar purpose.  (*See*, *e.g., Pine Mountain Pres., LLLP v. Comm'r of Internal Revenue*, 116 T.C.M. (CCH) 597 (T.C. 2018) (recognizing that a conservation easement provides little benefit to land suitable for hunting or timber, as compared to the benefit to a residential subdivision); *United States v. Baker*, 279 F.2d 603, 605 (9th Cir. 1960) ("It was established that strictly as farming land the areas were comparable, the same crop and approximately the same water potential existed. But it is clear that the other areas were of no help in determining the value of the land for residential purposes.")

Valuation is not an exact science and reasonable people can differ. However, the Tax Court's decision to wholly reject Appellants' expert valuation methodology as speculative and adopt a sales comparison methodology that compared the Property to sales of vastly different land, in different acreages,[22] violates the law in *Mitchell*, 267 U.S. at 344-345 (1925), *Stanley Works & Subsidiaries*, 87 T.C. at 400, and the Treasury Regulations cited above.  Its decision should be reviewed *de novo*, reversed, and the case returned to the Tax Court for proper valuation.

---

[22] Although the IRS Expert did not present it, Appellants believe comparison to sales of 5-acre residential lots in Hampton Island would have shown millions in donated value.

Indeed, even if held to a clear error standard, Appellants believe the decision to value the Property before the placement of the Easement by comparing it to land whose highest and best use is timber, recreation, aggregation or "unidentified future development" is clear error that requires reversal and return to the Tax Court with instruction to compare the Property to comparable properties whose highest and best use is residential subdivision. *Burbage*, 774 F.2d at 646.

## F. The Court Erred By Imposing A 40% Penalty.

The Tax Court held Appellants liable for a 40% gross valuation misstatement penalty, finding, not only that it was appropriate based on the disparity between the deduction and the IRS Expert's opinion on value, but that the disparity was more than 200%, meaning Appellants could not raise reasonable cause as a defense. IRC § 6662(c)(3).[23] This was error for multiple reasons.

### 1. The Relevant Law.

The IRS imposes a 40% penalty when the underpayment of tax is the result of a gross valuation misstatement, defined as a misstatement of more than 200%. IRC § 6662(h). While taxpayers can be excused from underpayment penalties if they demonstrate they acted with reasonable cause in good faith (as Appellants did here), the defense is not available if the valuation understatement is more than

---

[23] The Tax Court mistakenly cited to 26 USCA § 6662(c)**(2)** as opposed to § 6662(c)(3).

200%. IRC § 6664(c)(3).  Thus, proper assessment of the value of the Easement is also critical to the penalty analysis.

Moreover, by congressional directive designed to prevent the abusive threat of penalties by the IRS, **before** any penalty is first assessed, it must be approved, in writing, by an IRS supervisor.  IRC § 6751(b)(1) ("No penalty under this title shall be assessed unless the **initial determination** of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher-level official as the Secretary may designate.") (emphasis added).

The IRS has the burden of establishing a penalty is warranted.  IRC § 7491(c). To meet this burden at trial, it must present evidence demonstrating that it had the appropriate approval before the penalty was assessed.  *Graev v. Comm'r of Internal Revenue*, 149 T.C. 485, 493 (2017).

### 2.  The Tax Court's Errors On The Penalty.

In applying these rules and assessing a 40% gross valuation misstatement penalty, the Tax Court committed two errors.

First, as the existence and amount of the penalty is dependent on the existence and size of the valuation misstatement, the Tax Court was required to get the valuation right before it could assess a penalty.  As the Tax Court erred in determining the proper valuation (as set forth above), it was not in a position to

determine whether it was appropriate to apply a valuation penalty, let alone one for gross misstatement.  This requires reversal.

The second error is both substantive and procedural -- and is highly ironic in a case where the IRS seeks to hold taxpayers liable for allegedly failing to strictly comply with Tax Regulations.  As demonstrated by the trial transcript, the IRS did not produce evidence that they complied with the supervisor approval requirement in discovery or in compliance with the 14-day Rule of the Standing Order.  As admitted by counsel for the IRS:

> It is true that we did not provide this document to Petitioner until the date that he said, **last week**.

(JA1876-1877) (emphasis added).  This necessarily meant Appellants: (1) did not have an opportunity to evaluate the penalty approval form in discovery (where they could have assessed the date and the credentials of the alleged signatory); (2) did not have the opportunity to factor it into their settlement strategy; and (3) did not have an opportunity to factor it into their trial strategy, at least until the last minute.

Given these significant injuries, Appellants made a timely objection to introduction of the late produced evidence (JA1876-1877), which was remade in post hearing briefs.  (JA2074).  Appellants' objection was to no avail. Immediately after the Tax Court disallowed Appellants' deduction, ostensibly for their alleged failure to strictly comply with the substantiation requirements, the Tax Court allowed the IRS to introduce the evidence it had withheld to sustain the

penalty.  Indeed, the Tax Court improperly held that this was routinely done, was not prejudicial and that Appellants had not raised the issue substantively:

> …this Court has routinely found that reopening the record to admit the Civil Penalty Approval Form into evidence serves the interest of justice and is not prejudicial. *See, e.g.*, *Degourville v. Commissioner*, T.C. Memo. 2022-93. Petitioners did not raise compliance with section 6751(b)(1) before or, substantively, during trial and nevertheless received the form before the record was closed. It is therefore even more appropriate to accept the form into evidence.

(JA2207).

This was error – indeed, error that is likely to leave Appellants and the public believing the Tax Court uses a double standard favorable to the IRS. Reversal is required.

## VII.  CONCLUSION

With conservation easements, the American taxpayer has followed the direction of Congress and the Secretary.  While the IRS has a role to play it has not been given vigilante rights.  Here, the IRS exceeded its mandate, the Tax Court acquiesced and Appellants (and the entire Country) are injured.  This Court can and should restore the balance established by Congress.  Such restoration is achieved by reversing the improper documentation rulings and returning the case to the Tax Court to assess the proper valuation of the easement under the controlling laws.

## VIII. STATEMENT REGARDING ORAL ARGUMENT

Given the detailed factual record in this case, the complexity and importance of the legal issues involved, Appellants request the opportunity to present the issues at oral argument. Appellants believe the Court would be assisted by a concise presentation of the record and issues by counsel. Oral argument would afford both parties the opportunity to frame the issues before the Court and respond to any questions the Court may have.

Respectfully submitted this 31st day of August, 2023.

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

*/s/Steven G. Hall*
Steven G. Hall
Georgia Bar No. 319308
shall@bakerdonelson.com
Joshua Tropper
jtropper@bakerdonelson.com
Georgia Bar No. 716790
Suite 1500, Monarch Plaza
3414 Peachtree Rd. NE
Atlanta, Georgia 30326
Phone: 404-577-6000
Fax: 404-221-6501
*Counsel for Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _23-1314_    **Caption:** Brooks v. Commissioner of Internal Revenue

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___12,944___ [state number of] words

[ ] this brief uses monospaced type and contains _____ [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [identify word processing program] in
14; Times New Roman _____ [identify font size and type style]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [identify word processing program] in
_____ [identify font size and type style].

(s) _Steven G. Hall_____

Party Name _Kenneth Brooks & Anita Wolke Bro_

Dated: _08/31/2023_____