**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1314**

———————

KENNETH M. BROOKS; ANITA WOLKE BROOKS,

                    Petitioners - Appellants,

        v.

COMMISSIONER OF INTERNAL REVENUE,

                    Respondent - Appellee.

———————

Appeal from the United States Tax Court.  (Tax Ct. No. 28206-15)

———————

Argued:  May 10, 2024                              Decided:  July 15, 2024

———————

Before WILKINSON, NIEMEYER, and QUATTLEBAUM, Circuit Judges.

———————

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined.  Judge Quattlebaum wrote a separate opinion concurring in part and in the judgment.

———————

**ARGUED:**  Steven G. Hall, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Atlanta, Georgia, for Appellants.  Julie Ciamporcero Avetta, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Joshua Tropper, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Atlanta, Georgia, for Appellants.  David A. Hubbert, Deputy Assistant Attorney General, Jennifer M. Rubin, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————

NIEMEYER, Circuit Judge:

In this case, the Commissioner of Internal Revenue (1) disallowed a married couple's deductions on their income tax returns for a conservation easement granted to a local government and (2) imposed accuracy-related penalties for their gross valuation misstatements. The United States Tax Court upheld the Commissioner's action, and the taxpayers now challenge the Tax Court's decision.

In 2006, Kenneth Brooks and Anita Wolke Brooks, through their family limited liability company, purchased roughly 85 acres of vacant land in southeast Liberty County, Georgia, for $1.35 million and divided it into two parcels of roughly 44 acres and 41 acres, respectively. A year later, they granted Liberty County a conservation easement on the 41-acre parcel and claimed $5.1 million as a charitable deduction on their income tax returns, beginning with their 2007 return and continuing thereafter with carry-forward deductions through at least 2012. In 2015, the Commissioner issued the Brookses a notice of deficiency for their 2010, 2011, and 2012 tax returns, disallowing the deductions and assessing penalties. By that time, the statute of limitations had already run on the deductions that the Brookses had taken on their returns before 2010. The Commissioner concluded that the deductions failed to comply with multiple requirements of the Internal Revenue Code and regulations and that the Brookses' valuation of the donated property amounted to a "gross valuation misstatement."

The Brookses filed a petition with the Tax Court challenging the deficiency notice, and, following trial, the Tax Court upheld both the Commissioner's disallowance of the

charitable deductions related to the donation of the conservation easement and the imposition of a 40 percent penalty for a "gross valuation misstatement."

For the reasons that follow, we affirm.

I

In December 2006, Kenneth Brooks and Anita Wolke Brooks, who are physicians living and practicing in Falls Church, Virginia, purchased, through their family limited liability company, 85.314 acres of vacant property in the southeastern portion of Liberty County, Georgia, with the intent of building a vacation home and recreational facilities. Shortly before this purchase, the land had been owned by timber companies, who then conveyed it to the Brookses' seller, Hampton Island, LLC. Despite the seller's name, the property is not on an island, nor is it evident that there is any island nearby called Hampton Island. The Brookses' property is, however, contiguous to a 4,000-acre Planned Unit Development ("PUD") called "Hampton Island Preserve," but development there had hardly begun, as only two houses had been built in it, and what would be the primary road near the Brookses' property had not yet been built. The Brookses' property was not part of the Hampton Island Preserve PUD, and it was accessible only through an easement to a nearby road. It did have access to electrical and telephone lines, but not to water and sewer lines. While the property was roughly one-quarter mile east of I-95, access to I-95 was over 5 miles away. The property was zoned agricultural and could be, under the Liberty County zoning ordinance, subdivided into no more than 10 parcels with a minimum lot size of 5 acres.

At the time of the purchase, the Brookses divided the 85-acre property into one parcel of 45.113 acres and one parcel of 41.201 acres, and, a year later, on December 20, 2007, they granted Liberty County a conservation easement on the 41-acre parcel "for and in consideration of the sum of ten dollars ($10.00) and other good and valuable consideration," although the easement deed did not describe that "other consideration."

The easement deed prohibited development of the property and required that it be preserved in its natural state, albeit subject to the exercise of numerous rights reserved to the Brookses.  In particular, the deed reserved to the Brookses the right: (1) to construct two paddocks totaling 20 acres for horse boarding; (2) to construct a barn on one acre of land; (3) to construct fencing around the perimeter of the property and around the paddocks; (4) to install underground and overhead utilities, including water, electric, and cable lines; (5) to install lighting on the one-acre barn parcel; (6) to use five acres of the donated property for "agricultural activities," which were defined as "personal and commercial organic gardening"; (7) to mortgage, sell, and pledge the property; (8) to cut, burn, or remove vegetation deemed to be a nuisance species or with prior agreement of Liberty County; (9) to harvest timber to build the above-referenced paddocks; (10) to plant indigenous trees and shrubs; (11) to maintain and replace, if necessary, all existing road beds; (12) to use and enjoy the property for recreational activities not inconsistent with the purposes of the easement; and (13) to retain all other rights and privileges of ownership not expressly prohibited in the easement deed.  The Brookses attached to the easement deed a "boundary description" of the property, which included two maps, and a "Baseline Survey

Summary" of the property, consisting of three pages of substantive text that contained limited information on the general conditions of the donated property at the time.

Thus, even though the Brookses granted Liberty County a conservation easement over the 41-acre parcel, they retained rights to use the entire property recreationally and to develop over one-half of it into horse paddocks, a barn, and a large garden for personal and commercial purposes.

On their 2007 tax return, the Brookses claimed a $5.1-million charitable deduction for the "41.201 acre tract of vacant land" over which they had granted an easement to Liberty County and stated that the "cost or adjusted basis" for the 41-acre tract was $1.35 million, which was the total amount they had paid for the 85-acre parcel. They attached to their return an appraisal made by Jim R. Clower, Sr., an appraiser in Lawrenceville, Georgia, who valued the easement on the 41-acre parcel at $5.1 million, as well as the deed granting the easement, which had been signed by Liberty County. But they did not include any other document that purported to be a "contemporaneous written acknowledgment of the contribution by the donee organization," which was required under the tax laws. Such an acknowledgment had to disclose, among other things, all consideration provided by Liberty County in exchange for the easement and the value of such consideration. The Brookses took a deduction of $748,702 on their 2007 return for the donation and a carry-forward deduction of $1,004,654 on their 2009 return. Beginning in 2010, they took the carry-forward deductions that are subject to this action — $657,135 in 2010; $763,835 in 2011; and $743,862 in 2012.

On August 21, 2015, the Commissioner of Internal Revenue issued a notice of deficiency to the Brookses for their 2010, 2011, and 2012 tax returns. The notice stated that the Commissioner had "determined that the deduction claimed on [the Brookses'] return for contributions based on the donation of a conservation easement [was] disallowed in full because the donation fail[ed] to qualify as an allowable deduction under section 170, section 162, or any other section of the Internal Revenue Code." It also stated that the Commissioner had imposed a 40 percent accuracy-related penalty under 26 U.S.C. § 6662(h) for a "gross valuation misstatement." By the time the Commissioner assessed this deficiency for the Brookses' 2010, 2011, and 2012 tax returns, the statute of limitations had run with respect to the deductions they had claimed on their returns before 2010.

The Brookses filed a petition in the United States Tax Court, challenging the notice of deficiency.

Under the standing rules of the Tax Court, the parties were required to provide each other with all documents to be used at trial at least 14 days before the scheduled trial date. In this case, the Commissioner provided a document required for its case only 7 days before the trial — a document entitled IRS Civil Penalty Approval Form, which an IRS manager had to fill out before penalties could be assessed. Because its disclosure was 7 days late, the Brookses objected to the document's introduction into evidence.

At trial, in addition to lay factual witnesses, both the Brookses and the Commissioner presented expert testimony regarding the value of the easement. The Brookses no longer sought to defend the $5.1 million valuation that they provided to the IRS with their 2007 return. Rather, they retained another appraiser for trial, Duane Miller,

6

who valued the easement at $3.63 million. In doing so, he projected the fair market value of the 85-acre property before the easement as $7.66 million and after the easement as $4.03 million, with the difference being the $3.63 million value of the easement that he gave at trial. The Commissioner's expert projected the fair market value of the 85-acre property before the easement as $1.41 million and after the easement as $940,000, providing a fair market value of the easement on the 41-acre parcel as $470,000. During the trial, the Tax Court admitted into evidence the Civil Penalty Approval Form, in the interest of justice and the absence of prejudice.

On December 19, 2022, the Tax Court issued a decision both disallowing the deduction and imposing 40 percent penalties, as requested by the Commissioner. In disallowing the deduction, the court held (1) that the taxpayers had failed to satisfy the statutory requirement of producing a "contemporaneous written acknowledgment" that established the amount (if any) of consideration received from Liberty County for the donation of the conservation easement; (2) that the Brookses' Baseline Report included with the easement was insufficient to fulfill the requirement of demonstrating the status of the property at the time of the contribution, as required by 26 C.F.R. § 1.170A-14(g)(5); and (3) that the Brookses had misrepresented their basis in the easement property on their tax return, in violation of 26 C.F.R. § 1.170A-13(c), and had not provided reasonable cause to excuse doing so.

As for the 40 percent penalties for gross valuation misstatements, the Tax Court found that the "assumptions made by [the Brookses'] expert, [Duane] Miller, [were] insufficiently plausible to support his valuation." It noted that Miller's valuation was

predicated on assumptions regarding zoning changes and easement access that would have facilitated development of the property into residential housing but that the expert had not provided "any reason" for such assumptions. As a consequence, the court concluded that the assessment "was too speculative to yield an accurate valuation." In addition, the court noted that even if it were to find that the speculative development was plausible, "Mr. Miller's calculations include[d] significant errors inflating his valuation." Instead, the court found, in agreement with the Commissioner's expert, that the entire property's value before the easement was $1.41 million, which, it observed, was "consistent with the $1,350,000 price [the Brookses] paid for the subject property only one year" prior to the donation in question. The court also found that the same property's value after the grant was $940,000, such that the value of the easement was $470,000. In view of these findings, the court concluded that the Brookses had grossly misstated the value of the donated easement and were therefore liable for the 40 percent accuracy-related penalties for each of the three years at issue.

Accordingly, the Tax Court assessed a deficiency of $212,181 and penalty of $84,530.80 for the tax year 2010; a deficiency of $262,260 and penalty of $104,904 for the tax year 2011; and a deficiency of $252,885 and penalty of $101,154 for the tax year 2012.

From the Tax Court's decision, the Brookses filed this appeal. *See* 26 U.S.C. §§ 7482, 7483.

II

The Brookses contend first that they "complied (and certainly substantially complied) with the [tax] law's nuanced requirements" and that therefore their deduction should not have been disallowed. The Tax Court, however, affirmed the disallowance based on three independent failures by the Brookses: (1) their failure to provide the IRS with a contemporaneous written acknowledgment, as required by 26 U.S.C. §170(f)(8); (2) their failure to submit an adequate baseline report to Liberty County, as required by 26 C.F.R. § 1.170A-14(g)(5); and (3) their misrepresentation of their basis in the property subject to the easement and their failure to provide a reasonable excuse for doing so, in violation of 26 C.F.R. § 1.170A-13(c). Each failure was relied on independently by the Commissioner to disallow the deduction, and consequently we address each separately.

A

First, as to the contemporaneous written acknowledgment, 26 U.S.C. § 170(f)(8) provides that "*[n]o deduction shall be allowed . . .* for any [charitable] contribution of $250 or more *unless* the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B)." 26 U.S.C. § 170(f)(8)(A) (emphasis added). Subparagraph (B) provides, in turn, that the contemporaneous written acknowledgment must include (1) "the amount of cash and a description (but not value) of any property other than cash contributed"; (2) "whether the donee organization provided any goods or services in consideration, in whole or in part, for any property" donated; and (3) "a description and

good faith estimate of the value of any goods or services" provided as consideration. *Id.* § 170(f)(8)(B) (cleaned up).

When asked in deposition about whether the Brookses' 2007 tax return had a contemporaneous written acknowledgment, Mr. Brooks answered that he relied on the professionals whom he had hired and was "assured this was all aboveboard." The Brookses' discovery responses to the Commissioner, however, were more forthright, stating that at the time that the easement was granted, "[the Brookses] received a contemporaneous written acknowledgment, which satisfied the requirements of I.R.C. § 170(f)(8) and related regulations," but that they had lost it in the intervening years. After realizing the difficulty in relying on this response, the Brookses thereafter took the position that the easement deed *itself* satisfied the requirements for a contemporaneous written acknowledgment, noting that such an acknowledgment need not take any particular form and that the deed given by Liberty County contained all the information required for the acknowledgment.

They argue that the deed itself established that Liberty County paid *no consideration* for the easement, thus providing the information that would otherwise have been included in a separate contemporaneous written acknowledgment. While they recognize that the language of the deed included a statement of consideration — "for and in consideration of the sum of ten dollars ($10.00) and other good and valuable consideration" — they argue that such language was mere "boilerplate" and therefore should be disregarded. Rather, they argue, the deed should be taken "as a whole" and, when so considered, it satisfies 26 U.S.C. § 170(f)(8). They focus, in particular, on a "whereas" clause in the deed that recites

10

that Liberty County "acknowledge[d] that the Grantor has agreed to convey and *donate* the Conservation Easement" (emphasis added), arguing that "donate" there meant that they "g[ave] [the easement] *without receiving consideration* for the transfer," relying on the definition of "donate" in *Black's Law Dictionary*. *See Donate*, Black's Law Dictionary (11th ed. 2019).

The Commissioner contends that the deed, by its language, actually "leav[es] open the possibility that additional consideration was provided in exchange for the contribution," which means that the deed failed to satisfy the requirements of § 170(f)(8)(B). But the Commissioner reached this position through peculiar reasoning, noting that the consideration language in the deed was "boilerplate" and therefore could be "properly disregarded." Thus, in the absence of any statement as to consideration, the deed did not satisfy the requirements of § 170(f)(8)(B), which requires a statement disclosing any consideration and its value.

The Brookses, the Commissioner, and indeed the Tax Court all recognized that the clause in the deed reciting consideration — for "ten dollars ($10.00) and other good and valuable consideration" — was "boilerplate." Because the language was boilerplate, the parties argue that it can therefore be ignored. This reasoning is especially curious, because it depends on the proposition that boilerplate language in a contract may be ignored when interpreting the contract. If this were true, however, numerous clauses in numerous contracts would have to be ignored because they were formed with boilerplate language.

Using the same dictionary relied on by the Brookses, we note that *Black's Law Dictionary* defines "boilerplate" to mean "[r]eady-made or all-purpose language that will

11

fit in a variety of documents" and to mean "[f]ixed or standardized contractual language that the proposing party often views as relatively nonnegotiable." *See Boilerplate*, Black's Law Dictionary (11th ed. 2019). While boilerplate language in a contract is standardized language and therefore is thought to be language that was not negotiated, the language is not meaningless; it is the language of the contract, and contracts are "replete with boilerplate" language. *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994). Such boilerplate language is often included in deeds to refer to consideration generally and is understood to mean that, while consideration was given, the *specific amount* is not stated in the deed. *See Wood v. Roberts*, 586 P.2d 405, 407 (Utah 1978) ("[T]he deed itself specified the consideration to be 'Ten Dollars and other good and valuation considerations,' and evidence is admissible to show what that consideration was"); *Zorn v. Robertson*, 228 S.E.2d 804, 805 (Ga. 1976) ("[W]here the consideration is expressed only by way of recital, it is permissible to show by parol testimony that the true consideration is in fact different from that expressed in the deed"); *Finley v. Williams*, 29 S.W.2d 103, 106 (Mo. 1930) ("The fact that the sum of one dollar is stated as a consideration is modified by the next clause, 'and other good and valuable consideration,' and such clause is open to investigation and explanation"). Thus, that language as to consideration has been standardized does not mean it can be ignored. *See id*. Indeed, the parties did not ignore it but included it in the deed, and accordingly it must be taken into account. Moreover, were such language describing consideration to be ignored, the parties could be faced with the argument that the contract lacked consideration and was therefore unenforceable.

The language here provided that consideration was $10.00 *and* other unspecified consideration.  And, because the deed did not describe the other consideration, it could well have been an agreement by Liberty County to modify zoning for the Brookses' property or to reduce the Brookses' taxes or to provide them with infrastructure support, any of which would not be uncommon in connection with a real estate transaction, especially one involving property that was subject to development.  The deed simply does not specify the amount or nature of the consideration for the deed, which could have been additional money or other benefits.

Furthermore, the Brookses' reliance on the use of the word "donate" in the "whereas" clauses provides them no support.  The "whereas" clauses express background facts and recitals for the agreements in the deed, but they are not the "operative" terms and conditions of the deed.  *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985) ("Although statements in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document" (cleaned up)).  The "whereas" clause here says, "Whereas, [Liberty County] acknowledges that the [Brookses] *ha[ve] agreed* to convey and *donate*" the easement, but the deed itself provides the terms and conditions of the donation.  (Emphasis added).  And in this case, the donation was, according to the contract, in fact made for payment by Liberty County of "ten dollars ($10.00) and other good and valuable consideration."  As such, the terms of the deed unambiguously call for the exchange of consideration, even if the amount was not specified.

13

The parties also devote many pages arguing the consequence of the deed's lack of a merger clause. The Commissioner suggests that, in the absence of a merger clause, other consideration — apart from that specified in the deed — could have exchanged hands thereby rendering the deed an inadequate contemporaneous written acknowledgment. The Brookses disagree. But whether there was or was not a merger clause is of no moment because the deed itself specifies that *other good and valuable consideration* was indeed given, without specifying its nature and value.

Accordingly, we conclude that the deed did not satisfy the requirements of a contemporaneous written acknowledgment, as stated in § 170(f)(8), because it failed to state "[w]hether [Liberty County] provided any goods or services in consideration, in whole or in part, for [the easement donated]" and to provide a "description and good faith estimate of the value of any goods or services referred to in [the prior] clause." 26 U.S.C. § 170(f)(8)(B)(ii)–(iii). Thus, as directed by the statutory provision, "No deduction shall be allowed." *Id.* § 170(f)(8)(A).

The Brookses contend nonetheless that the Tax Court's ruling on this issue was "formulaic," "unfair," and "hyper-technical" and that they had substantially complied with the statutory requirements. But this argument overlooks the nature of charitable deductions, the obligations of the Commissioner in enforcing the Internal Revenue Code, and the abuse that the specified information was designed to address.

First, "an income tax deduction is a matter of legislative grace." *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943). As such, deductions "are strictly construed and allowed only 'as there is a clear provision therefor.'" *INDOPCO, Inc. v. Comm'r*, 503

14

U.S. 79, 84 (1992) (quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934)). And "the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Interstate Transit*, 319 U.S. at 593.

But it does not even require a strict construction to recognize that § 170(f)(8) requires the disallowance of a charitable contribution — stating, "*[n]o deduction shall be allowed*" — *unless* the taxpayer provides the IRS with a contemporaneous written acknowledgment. 26 U.S.C. § 170(f)(8)(A) (emphasis added). In view of the fact that the Brookses did not satisfy the requirement of such an acknowledgment, especially its important term of stating the consideration that they received, if any, from Liberty County in exchange for the donation, it is hardly appropriate for them to argue that enforcement of the provision was hyper-technical or indeed unfair.

Moreover, strict enforcement of these charitable contribution requirements is necessary to prevent the abuse of conservation easements. To be sure, conservation easements serve a beneficial societal function, allowing property owners to restrict in perpetuity development on land that is inconsistent with the terms of the easement with the goal of maintaining a property's unique ecological and historical attributes. But because the valuation of the easements can be subject to "little more than the imagination of the appraiser" valuing the property, *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 160 n.3 (4th Cir. 2022), claiming such charitable deductions can be the product of abuse.

As conservation easements increased in the 1980s, Congress became aware of the potential for abuse and attempted to combat it by imposing more stringent substantiation requirements in the Deficit Reduction Act of 1984. The provisions of that Act were meant

"to provide a mechanism whereby [the Commissioner] would obtain sufficient return information in support of the claimed valuation of charitable contributions of property to enable [the Commissioner] to deal more effectively with the prevalent use of overvaluations." *Hewitt v. Comm'r*, 109 T.C. 258, 265 (1997), *aff'd*, 166 F.3d 332 (4th Cir. 1998) (citing S. Comm. on Finance, Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, S. Prt. 98–169, vol. I, at 444–445 (S. Comm. Print 1984)).   But even with these efforts, the valuations of conservation easements relied on for charitable deductions have grown disproportionately, outstripping even the explosive growth in the amount of land donated, suggesting the need for greater scrutiny of appraisals provided for those deductions.   "The deduction, once estimated to cost the federal government less than $10 million a year, now costs billions of dollars annually" in lost revenue.   Andrew Flynn, *Restoring the Conservation Purpose in Conservation Easements: Ensuring Effective and Equitable Land Protection Through Internal Revenue Code Section 170(h)*, 40 Stan. Env't L.J. 3, 6 (2021).   By 2016, the revenue lost to the deduction was "comparable with the entire budgets of the National Park Service, Fish and Wildlife Service, and Bureau of Land Management." *Id.* at 7.

In short, while a conservation easement provides a public benefit, it also offers an avenue for abuse.  And it is precisely to address such abuse that the strict enforcement of deduction requirements for donations of conservation easements is necessary.  Fairness cannot be defined as a relaxation of those requirements.

Accordingly, we affirm the Tax Court's disallowance of the Brookses' charitable deduction simply by applying the requirements of § 170(f)(8) as written.

16

B

As to the sufficiency of the Baseline Report that the Brookses provided to Liberty

County, 26 C.F.R. § 1.170A-14(g)(5) required that the Brookses provide documentation to

the County describing the baseline status of the property so as to fix the scope of the

easement at the time of the donation and therefore enable its enforcement later against

encroachment by the Brookses or others.  This requirement is necessary to prevent the very

core of potential abuse.  The governing regulation provides first:

> A deduction under section 170 is generally not allowed for a charitable
> contribution of any interest in property that consists of less than the donor's
> entire interest in the property . . . .  However, a deduction may be allowed
> under section 170(f)(3)(B)(iii) for the value of a qualified conservation
> contribution if the requirements of this section are met.

26 C.F.R. § 1.170A-14(a).  It then provides:

> [F]or a deduction to be allowable under this section the donor *must make*
> *available* to the donee, prior to the time the donation is made, documentation
> sufficient to establish the condition of the property at the time of the gift.
> Such documentation is designed to protect the conservation interests
> associated with the property, which although protected in perpetuity by the
> easement, could be adversely affected by the exercise of the reserved rights.

*Id.* § 1.170A-14(g)(5) (emphasis added).  Finally, it suggests how the documentation

requirement may be satisfied with maps and photographs of various types, demonstrating

the scope and nature of conserved areas, *id.* § 1.170A-14(g)(5)(i)(A)–(D), and it requires

that the donee, at the time of donation, confirm that the documentation is "accurate," *id.*

§ 1.170A-14(g)(5)(i)(D).

The conservation easement deed in this case grants, in perpetuity, an easement "to

assure that the Protected Property will be retained forever predominantly in its natural,

17

scenic and open condition" and "to protect any rare plants, animals, or plant communities on the Protected Property." The deed also includes a description of the extensive rights that the donors reserved from the contributed estate. Attached to the deed was a metes and bounds description of the 41-acre parcel, together with two maps depicting it. Also included with the deed was a "Baseline Survey and Documentation Report," which purported to comply with 26 C.F.R. § 1.170A-14(g)(5).

The Baseline Report described the 41.201 acres of property as:

> Property was in commercial timber until fairly recently. Much of the property now is a grassy pasture. There are isolated hardwoods throughout the interior of the property. Nearly adjacent to the north side of Boy Scout Camp Road, which runs roughly through the center of the property.

This Baseline Report also included "Geological Information" about the "Coastal Plain" region of which the property is a part, reproducing general information of the region prepared in 1976 by the Department of Geology of the University of Georgia. None of the geological information, however, was specific in location or time to the donated property or even the contiguous Hampton Island Preserve area. Finally, the Baseline Report referred briefly and generally to "soils," "ecological features," and "public benefits," deferring for detail to an attached "photo of [the] property" and, as to ecological features, to "the photographs section." But the Report included no such photographs, nor did it provide any further descriptions.

In short, the Baseline Report provided no specifics about where timber, open fields, special plant life, and habitats were located, such that at a later time a portion of the property could be identified as being impermissibly degraded by the exercise of the rights

18

reserved by the Brookses.  And those rights were extensive, covering 16 numbered paragraphs.  They included the right to construct "two (2) paddocks totaling twenty (20) acres for horse boarding and use"; to construct "one (1) barn on one (1) acre of land in the paddocks area"; to construct "rail fencing around the perimeter of the Protected Property"; to "install underground and overhead utilities including water, electric, and cable lines"; to use "five (5) acres of the Protected Property for limited 'agricultural activities[]' . . . limited to personal and commercial organic gardening"; "to harvest timber for the purpose of construction of the paddocks (as set forth above)"; and "to plant indigenous trees and shrubs including, but not limited to, the red cedar and wax myrtle on the Protected Property."  The Brookses thus reserved to themselves the right to develop over one-half of the property covered by the conservation easement, and the Baseline Report provides no indication where such development will take place or what parts of the property will be protected from development, resulting in the inability of anyone, after the contribution, to enforce the easement.

The Tax Court thus found that the documentation failed to satisfy the regulatory requirements.  After cataloguing the Baseline Report's deficiencies in describing vegetation, flora, fauna, and distinct natural features, the court focused on the lack of delineation between protected and unprotected locations of the property:

> While the Easement Deed authorizes Liberty County to enter the encumbered parcel to conduct inspections to ensure ongoing compliance, the information in the Baseline Report is insufficient for us to evaluate whether changes fall within the limits of the reserved rights.  The deed allows for the harvesting of forests on the property but only for construction of two paddocks.  The document does not describe the sizes or locations of the forests, so it would

be at a minimum difficult and at a maximum impossible to gauge whether the amount harvested was reasonable for the construction of two paddocks.

Thus, the court concluded that because the Baseline Report could not serve "to protect the conservation interests associated with the property, which . . . could be adversely affected by the exercise of the reserved rights" (quoting 26 C.F.R. § 1.170A-14(g)(5)(i)), the deduction must be disallowed.

The Brookses argue that, for a number of reasons, the Tax Court should be reversed, contending first:

> Nothing about TR § 1.170A-14(g)(5) contemplates or creates an active role for the IRS in either dictating the baseline documents supplied to the donee or second guessing that which has already been approved by the donee. Certainly, nothing contemplates that a third-party IRS agent who was not involved in the back and forth between the donor and the donee, is not familiar with the property donated, may not know anything about its conservation purpose, may have no experience in assessing what is necessary to monitor a conservation easement, and may be looking at it years later, will have authority to *subjectively* decide the documentation a qualified donee organization certified as adequate, was not.

This argument, however, does not merely miss the forest for the trees; it misses both. The deduction for the conservation easement is authorized by the Internal Revenue Code as an exception to the general proposition that donors gift *their entire interest* in property. *See* 26 U.S.C. § 170(f)(3)(B)(iii); *see also* 26 C.F.R. § 1.170A-14(a). And the burden falls on the taxpayer to justify *to the IRS* the deduction for such a donation. The Commissioner viewed the Brookses' effort to justify their donation and, *based on what the Brookses provided to the IRS*, disallowed the donation. It was not up to the Brookses and Liberty County to agree to waive requirements for justifying the deduction, as the Brookses argue. Moreover, there is no requirement that an IRS agent visit the property when enforcing the

Tax Code and its regulations. The burden of providing a meaningful baseline report rested on the Brookses, and the Tax Court found that they did not carry this burden.

In a similar vein, the Brookses argue that "even if the IRS were deputized to challenge the baseline documentation Liberty County *certified as adequate*, the [Tax] Court's finding otherwise was error." (Emphasis added). They claim the Internal Revenue Code and regulations do not authorize an IRS agent to second guess the County's certification and "years later" determine that "the documentation [that] a qualified donee organization *certified as adequate*, was not." (Emphasis added). The only evidence about this argument in the record, however, is the fact that Liberty County signed the conservation easement deed and the Baseline Report, "acknowledg[ing] and certify[ing]" that the baseline documentation was an "accurate representation as of the date of the grant." *See* 26 C.F.R. § 1.170A-14(g)(5)(i)(D) (requiring such language). Thus, while the County agreed that the Baseline Report, to the extent it included any information, was "accurate," it did not certify that it was "adequate," as the Brookses seem to assume. But more importantly, the adequacy of the documentation to support a charitable deduction had to be determined by the IRS, not Liberty County.

Finally, the Brookses argue that even if the Baseline Report was not "perfect," they substantially complied with the regulatory requirements, citing *Bond v. Comm'r*, 100 T.C. 32, 41 (1993). To be sure, we have recognized that compliance with regulatory requirements, unlike statutory requirements, can in some cases be judged against the more lenient standard of substantial compliance. But we have also emphasized that the "tax laws are technical and, for the most part, are to be accordingly interpreted." *Hull v. United*

*States*, 146 F.3d 235, 238 (4th Cir. 1998) (cleaned up).  Thus, we have held that in narrow circumstances, courts can relieve taxpayers of "perfect compliance" with regulatory requirements.  *Volvo Trucks of N.A., Inc. v. United States*, 367 F.3d 204, 210 (4th Cir. 2004).  But in doing so, we required that the court find that "the taxpayer ha[d] made a good faith effort at compliance or ha[d] a 'good excuse' for noncompliance, and [that] (1) the regulatory requirement [was] not essential to the tax collection scheme but rather [was] an unimportant or 'relatively ancillary requirement' or (2) the regulatory provision [was] so confusingly written that it [was] reasonably subject to conflicting interpretations." *Id.*

In this case, the Brookses have failed both to satisfy the documentation requirements and to make a showing as to why they should be relieved from doing so.  The baseline report is not a "relatively ancillary requirement" nor is the regulation "confusingly written," and the Brookses provided no "good excuse" for their noncompliance.  As the Tax Court concluded, their Baseline Report was woefully inadequate, providing virtually no mechanism by which a reasonable person could delineate the Brookses' reserved rights from the rights conveyed to Liberty County in the easement.  Because the baseline report was a mandatory condition — indeed essential — for defining and claiming a conservation easement as a charitable contribution, the Tax Court properly treated the inadequacy of the Brookses' Baseline Report as a basis for disallowing the deductions.

C

Finally, the Tax Court disallowed the deductions because the Brookses misstated in their tax returns their basis in the property that supported their $5.1 million deduction. They represented that their basis in the property subject to the donated easement was $1.35 million, when in fact the basis was roughly $652,000 (1,350,000 ÷ 85.314 x 41.201).

Section 1.170A-13 sets forth the requirements for claiming deductions for charitable contributions. And in connection with the valuation of an easement for charitable deductions, it provides that the taxpayer must obtain a qualified appraisal and attach a "fully completed appraisal summary" with his return. 26 C.F.R. § 1.170A-13(c)(2)(i). The regulations provide further that the appraisal summary must include "[t]he cost or other basis of the property." *Id.* § 1.170A-13(c)(4)(ii)(E).

IRS Form 8283 (Noncash Charitable Contributions) calls for this required information about the donated property, and in the completed Form 8283 that the Brookses submitted to the IRS, they described "the donated property" as "41.201 acre tract of vacant land"; gave a "brief summary of the overall physical condition of the property" as "vacant land"; gave its "appraised fair market value" as $5.1 million; gave "[d]ate acquired" as "12/15/06"; described "[h]ow acquired" as by "purchase"; gave their "cost or adjusted basis" as "$1,350,000"; and "claimed as a deduction" $5.1 million.

To be sure, the Brookses did pay $1.35 million for a parcel *consisting of 85 acres* of vacant land, but they then subdivided that parcel into two — one parcel of 44 acres and one of 41 acres. The conservation easement that they granted to Liberty County, for which they claimed a deduction, covered the 41-acre parcel, which was less than one-half the

23

original property purchased.  The basis of this parcel therefore was only $652,000.  Thus, the disclosure that the Brookses made of their "cost or adjusted basis" for the conservation easement was clearly erroneous, overstating the basis by more than 100 percent.

Rather than concede error and provide the Commissioner with an explanation, the Brookses claimed that they complied with the tax form because "they stated the basis for the full Property, as opposed to the 41-acre Parcel," and "[n]othing about Form 8283 tells a taxpayer what to do in the circumstances" where the purchasers buy a larger parcel, divide it in two, and put an easement on a subdivided parcel.  Such an argument appears to be deliberate obfuscation.  Certainly, it cannot be made in light of the filled-out Form 8283 that they provided in 2007.  The questions were clear, as were the answers.  The Form, as filled out, addressed *one parcel of land* which the Brookses described as "41.201 acre tract of vacant land."  There was no disclosure of the larger parcel or of the circumstances of dividing the larger parcel.  Then, with respect *to that 41-acre parcel*, the Brookses gave the basis as $1.35 million — obviously an error — and with respect to an easement on *that property*, the Brookses claimed a deduction of $5.1 million.  The Brookses' argument that they were confused by the form is unsupported by any evidence but appears simply to be manufactured for argument.

Alternatively, the Brookses argue that they substantially complied with the requirement to provide the property's "cost or adjusted basis."  But claiming a cost or adjusted basis of $1.35 million, when it was actually $652,000, cannot be considered substantial compliance.

24

The consequences of the Brookses' misstatement were not insignificant. It worked to conceal just how excessive the valuation of the easement in this case was. By reporting a $1.35 million basis, the Brookses suggested to the IRS that the property's value increased roughly 3.8 times in one year, a facially implausible number but not nearly as egregious as a roughly 7.8-fold increase in value that reporting the correct basis of roughly $652,000 would have revealed. And reporting the correct basis was an important requirement because, as the Commissioner notes, "extraordinary claim[s] of increased value . . . ma[ke] the abusive transaction[s] far clearer and provide[] better notice to the IRS."

The Tax Court explained that because such a misstatement was substantial and the Brookses did not show "reasonable cause" as opposed to "willful neglect," 26 U.S.C. § 170(f)(11)(A)(ii)(II), the deduction should be disallowed, especially in the context of the other deficiencies relating to the claimed deduction. *See id.* § 170(f)(11)(A)(i). We cannot conclude that the Tax Court clearly erred in its findings.

## III

The Internal Revenue Code imposes a penalty on any portion of an underpayment of tax attributable to a substantial "valuation misstatement." *See* 26 U.S.C. § 6662(a), (b)(3). While the penalty in most cases is 20 percent, *see id.* § 6662(a), if the underpayment "is attributable to one or more *gross* valuation misstatements," the penalty is 40 percent, *id.* § 6662(h)(1) (emphasis added). A "valuation misstatement" is "gross" when "the value of any property . . . claimed on any [tax] return . . . is 200 percent or more of the amount determined to be the correct amount of such valuation." *Id.* § 6662(e)(1)(A), (h)(2). In

other words, if the claimed value of property on a tax return is more than two times its

"correct" value, a 40 percent penalty is applied to the underpayment of taxes that resulted

from the excess valuation.

Tax regulations provide the appropriate method for valuing conservation easement

contributions, stating:

> The value of the contribution under section 170 in the case of a charitable
> contribution of a perpetual conservation restriction is the fair market value
> of the perpetual conservation restriction at the time of the contribution. . . .
> If no substantial record of market-place sales is available to use . . . the fair
> market value of a perpetual conservation restriction is equal to the difference
> between the fair market value of the property it encumbers before the
> granting of the restriction and the fair market value of the encumbered
> property after the granting of the restriction.

26 C.F.R. § 1.170A-14(h)(3)(i). When the before-and-after valuation method is used, the

value of the property before the contribution "must take into account not only the current

use of the property but also an *objective* assessment of how immediate or remote the

likelihood is that the property, absent the restriction, would in fact be developed, as well

as any effect from zoning, conservation, or historic preservation laws that already restrict

the property's potential highest and best use." *Id.* § 1.170A-14(h)(3)(ii) (emphasis added).

And we have defined a property's highest and best use as that use that "would bring the

highest price," which is generally "presumed to be its current use." *United States v. 69.1*

*Acres of Land, More or Less, Situated in Platt Springs Twp.*, 942 F.2d 290, 292 (4th Cir.

1991) (in connection with a condemnation case). If a property owner seeks to define the

highest and best use in a different manner, he must show that the use was "'*reasonably*

*probable*' and that the probability has a real market value." *Id.* (emphasis added) (quoting

*Olson v. United States*, 292 U.S. 246, 257 (1934)).  Determination of the highest and best use involves an *objective assessment*, as the regulation provides.  *See* 26 C.F.R. § 1.170A-14(h)(3)(ii).

In this case, both the Brookses and the Commissioner presented expert testimony as to the valuation of the conservation easement that the Brookses granted to Liberty County, and both experts used the before-and-after method of valuation.  The Brookses' expert, Duane Miller, valued the easement property with the highest and best use as a subdivision development, and he took an income approach — using the income from sales of large individual houses.  Under this approach, he presumed that were it not for the contribution of the easement, the property would have been fully developed and concluded that the easement had a value of $3.36 million.  The Commissioner's expert, George Petkovich, valued the entire original property before the contribution of the conservation easement at $1.41 million, which was in line with the $1.35 million price that the Brookses had paid a year earlier.  In his valuation, Petkovich allowed the possibility that the Brookses' property would be annexed to and could be developed as part of the Hampton Island Preserve PUD. And after valuing the entire property after the easement at $940,000, Petkovich subtracted that number from the $1.41 million to arrive at the easement's value of $470,000.

The Tax Court found that Miller's approach was "too speculative to yield an accurate valuation."  The court stated that "[t]he assumptions made by" Miller were "insufficiently plausible to support his valuation" — assumptions regarding zoning changes and road access that would have enabled development of the property into residential housing.  The court noted that Miller

> did not cite any reason, and [the Brookses] provided no support, for the contention that Liberty County would approve a zoning change. He also provided no basis, and [the Brookses] provided no evidence, for presuming that neighboring property owners who granted easement access to the nearest highway and main roadway would support such development.

The court noted further that even if it "were to find that development was plausible, Mr. Miller's calculations included significant errors inflating his valuation." The court noted that Miller had

> incorrectly identified the zoning of the subject property; stated an incorrect location of the subject property in relation to Interstate 95; and identified the immediate neighborhood as comprising single family homes when all of Hampton Island Preserve had only two homes built at the time of the easement donation.

The court also took issue with the comparable sales that Miller used to verify the reasonableness of his estimate, noting that Miller "ignored the fact that the 2006 sale of the property in issue" for $1.35 million "would have provided an arm's-length and very appropriate comparable to a theoretical sale" of the property in 2007.

Adding to its findings as to Miller's valuation, the Tax Court found that, "aside from the [specific] issues," Miller's conclusion was "incredible as a practical matter"; the Court was incredulous that "a fair market value for the conservation easement, a subset of property rights," would be six times the "per-acre amount for which" the property had been purchased in fee simple "just 377 days earlier."

Instead, the court found more persuasive the evidence presented by the Commissioner's expert, Petkovich, which was "consistent with the $1,350,000 price [the Brookses] paid for the subject property only one year earlier in an arm's-length transaction for cash" and which valued the easement at $470,000.

28

Because the court concluded that the Brookses' claimed value for the easement of $5.1 million was more than 200 percent of its correct value of $470,000, it upheld the Commissioner's application of the 40 percent penalty.

The Brookses face a substantial burden in challenging these factual findings of value. Like most factual determinations, determinations of fair market value are subject to review only for clear error. *Gow v. Comm'r*, 19 F. App'x 90, 94 (4th Cir. 2001) (per curiam); *Burbage v. Comm'r*, 774 F.2d 644, 646 (4th Cir. 1985). In addition, "the Tax Court's credibility determinations, in particular, are entitled substantial appellate deference." *Baxter v Comm'r*, 910 F.3d 150, 159 (4th Cir. 2018).

The Brookses attempt to diminish this deferential standard of review by arguing that the Tax Court "accept[ed] an appraisal that does not follow *the legal requirements*" (emphasis added) and thus that its decision was subject to de novo review. But this argument mischaracterizes the nature of the Tax Court's holding. If the Tax Court had rejected Miller's valuation *methodology* as erroneous, we would indeed be required to review that legal proposition de novo. But the Tax Court did not reject Miller's methodology. Rather, it disagreed with the factual assumptions that Miller relied on to reach his conclusions, finding that Miller's value was not realistic, which is a question of fact. In short, the Tax Court relied on a bevy of mistakes and faulty factual assumptions in rejecting Miller's evaluation, and the Brookses have not shown that the facts found by the Tax Court were clearly erroneous.

Thus, based on the record, we conclude that the Tax Court did not clearly err in finding that the value of the easement that the Brookses donated to Liberty County was

$470,000, and not $5.1 million or $3.63 million, as claimed at trial.  Accordingly, we affirm the court's imposition of the 40 percent penalty.

IV

Finally, the Brookses contend that the Tax Court abused its discretion in admitting into evidence the IRS Civil Penalty Approval Form, which documented that an IRS manager had approved the assessment of a penalty against the Brookses and which was required before the IRS could assess such a penalty.  *See* 26 U.S.C. § 6751(b)(1).

The Commissioner provided the Brookses with a copy of the Approval Form seven days before trial, as the Commissioner intended to introduce it into evidence at trial.  But the Commissioner's production on this date violated the Tax Court's standing order, which required that documents intended for use at trial be provided 14 days before trial.

The Tax Court recognized the Commissioner's violation but observed that the Brookses "did not raise compliance with § 6751(b)(1) before or, substantively, during trial and nonetheless received the form before the record was closed."  The court also observed that, just as it had in the past reopened the record to admit the Form because doing so "serve[d] the interest of justice and [was] not prejudicial," it would do so in this case as well.

While the Brookses nonetheless insist that the Tax Court erred in admitting the document, we review the issue as a matter of *discretion*.  And when considering trial management, we grant trial courts "wide latitude."  *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986); *see also Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385,

30

396 (4th Cir. 2014) (noting "the broad discretion accorded to district courts to supervise discovery, including the imposition of sanctions for discovery abuses, as part of their case-management authority"). The Brookses have pointed to nothing here that would lead us to upset that deference. Neither below, nor on appeal, have they raised any legitimate harm that they suffered by the seven-day delay in disclosure, which left them still with receipt of the report seven days before trial. And even after they received the form, they did not raise questions as to its validity or seek further discovery.

We conclude that the Tax Court did not abuse its substantial discretion in admitting the Approval Form into evidence.

V

The issues before us are influenced by a gentle tension between a defined public policy of favoring, for the public good, perpetual conservation easements and the strict requirements imposed on taxpayers when claiming charitable deductions for granting such easements. While the deduction promotes the public policy — and indeed conservation easements have ballooned in number as a result — a claim for such deduction still must be accompanied by the traditional restrictions imposed to regulate abuse, which likewise has ballooned.

The Brookses saw a good thing both in the tax benefit to them and in the conservation easement for the public, but they acted with an evident greed that substantially outweighed their concern for the public benefit. Their documentation was sloppy and inadequate. But more remarkable was their attempt to claim a $5.1 million deduction for

a limited easement estate on property that they had purchased in fee simple for $652,000 only a year earlier.  Such a claim simply does not pass any reasonable smell test, much less the tax law's requirements.  It also should not be overlooked that because the IRS did not challenge the Brookses' deductions earlier, the Brookses have, despite their deficiencies in compliance, received the benefit of having deducted $1.75 million for the years before 2010.

For the reasons we have explained, we affirm the decision of the Tax Court.

AFFIRMED

QUATTLEBAUM, Circuit Judge, concurring in part and in the judgment:

I concur in the majority's bottom-line judgment and join its opinion in all but Parts II.B and II.C. As to those portions of the opinion—which regard the Brookses' baseline documentation and the basis they reported in their appraisal summary to the IRS—I think the record presents a close call. But the Brookses must run the table on all three of their disallowance arguments. So, affirming the Tax Court's decision that the deed is not a contemporaneous written acknowledgement is enough to affirm its decision on disallowing the deductions the Brookses claimed. On disallowance, I would stop there.